EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
*v.* ARABIAN AMERICAN OIL CO. ET AL.

No. 89–1838.   Argued January 16, 1991—Decided March 26, 1991*

---

*Together with No. 89–1845, *Boureslan* v. *Arabian American Oil Co.,*
*et al.*, also on certiorari to the same court.

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed an opin-

ion concurring in part and concurring in the judgment, *post*, p. 259. MAR-SHALL, J., filed a dissenting opinion, in which BLACKMUN and STEVENS, JJ., joined, *post*, p. 260.

*Solicitor General Starr* argued the cause for petitioners in both cases. With him on the briefs for petitioner in No. 89–1838 were *Assistant Attorney General Dunne, Deputy Solicitor General Roberts, Stephen L. Nightingale, Donald R. Livingston,* and *Gwendolyn Young Reams. Michael A. Maness* and *Gerald M. Birnberg* filed a brief for petitioner in No. 89–1845.

*Paul L. Friedman* argued the cause for respondents in both cases. With him on the brief were *Thomas J. O'Sullivan, Anne D. Smith, John D. Roady, V. Scott Kneese,* and *Gregory B. Richards.*†

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

These cases present the issue whether Title VII applies extraterritorially to regulate the employment practices of United States employers who employ United States citizens abroad. The United States Court of Appeals for the Fifth

---

†Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Jane M. Picker, Sidney Picker, Jr., Isabelle Katz Pinzler,* and *John A. Powell;* for the International Human Rights Law Group by *Robert Plotkin* and *Steven M. Schneebaum;* for the Lawyers' Committee for Civil Rights Under Law by *Gary B. Born, Robert F. Mullen, David S. Tatel, Norman Redlich, Thomas J. Henderson,* and *Richard T. Seymour;* and for NAACP Legal Defense and Educational Fund, Inc., et al., by *Julius LeVonne Chambers* and *Charles Stephen Ralston.*

Briefs of *amici curiae* urging affirmance were filed for the Equal Employment Advisory Council by *Robert E. Williams, Douglas S. McDowell,* and *Edward E. Potter;* for the Rule of Law Committee et al. by *Cecil J. Olmstead;* for the Society for Human Resources Management by *Kenneth Kirschner, John E. Parauda,* and *Lawrence Z. Lorber;* and for the Washington Legal Foundation by *Jeffrey I. Zuckerman, Daniel J. Popeo,* and *Paul D. Kamenar.*

Circuit held that it does not, and we agree with that conclusion.

Petitioner Boureslan is a naturalized United States citizen who was born in Lebanon. The respondents are two Delaware corporations, Arabian American Oil Company (Aramco), and its subsidiary, Aramco Service Company (ASC). Aramco's principal place of business is Dhahran, Saudi Arabia, and it is licensed to do business in Texas. ASC's principal place of business is Houston, Texas.

In 1979, Boureslan was hired by ASC as a cost engineer in Houston. A year later he was transferred, at his request, to work for Aramco in Saudi Arabia. Boureslan remained with Aramco in Saudi Arabia until he was discharged in 1984. After filing a charge of discrimination with the Equal Employment Opportunity Commission (EEOC or Commission), he instituted this suit in the United States District Court for the Southern District of Texas against Aramco and ASC. He sought relief under both state law and Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. §§ 2000e–2000e–17, on the ground that he was harassed and ultimately discharged by respondents on account of his race, religion, and national origin.

Respondents filed a motion for summary judgment on the ground that the District Court lacked subject-matter jurisdiction over Boureslan's claim because the protections of Title VII do not extend to United States citizens employed abroad by American employers. The District Court agreed and dismissed Boureslan's Title VII claim; it also dismissed his state-law claims for lack of pendent jurisdiction and entered final judgment in favor of respondents. A panel for the Fifth Circuit affirmed. After vacating the panel's decision and rehearing the case en banc, the court affirmed the District Court's dismissal of Boureslan's complaint. Both Boureslan and the EEOC petitioned for certiorari. We granted both petitions for certiorari to resolve this important issue of statutory interpretation. 498 U. S. 808 (1990).

Both parties concede, as they must, that Congress has the authority to enforce its laws beyond the territorial boundaries of the United States. Cf. *Foley Bros., Inc.* v. *Filardo,* 336 U. S. 281, 284–285 (1949); *Benz* v. *Compania Naviera Hidalgo, S. A.,* 353 U. S. 138, 147 (1957). Whether Congress has in fact exercised that authority in these cases is a matter of statutory construction. It is our task to determine whether Congress intended the protections of Title VII to apply to United States citizens employed by American employers outside of the United States.

It is a longstanding principle of American law "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Foley Bros.,* 336 U. S., at 285. This "canon of construction . . . is a valid approach whereby unexpressed congressional intent may be ascertained." *Ibid.* It serves to protect against unintended clashes between our laws and those of other nations which could result in international discord. See *McCulloch* v. *Sociedad Nacional de Marineros de Honduras,* 372 U. S. 10, 20–22 (1963).

In applying this rule of construction, we look to see whether "language in the [relevant Act] gives any indication of a congressional purpose to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *Foley Bros., supra,* at 285. We assume that Congress legislates against the backdrop of the presumption against extraterritoriality. Therefore, unless there is "the affirmative intention of the Congress clearly expressed," *Benz, supra,* at 147, we must presume it "is primarily concerned with domestic conditions." *Foley Bros., supra,* at 285.

Boureslan and the EEOC contend that the language of Title VII evinces a clearly expressed intent on behalf of Congress to legislate extraterritorially. They rely principally on two provisions of the statute. First, petitioners argue that the statute's definitions of the jurisdictional terms "em-

ployer" and "commerce" are sufficiently broad to include United States firms that employ American citizens overseas. Second, they maintain that the statute's "alien exemption" clause, 42 U. S. C. §2000e–1, necessarily implies that Congress intended to protect American citizens from employment discrimination abroad. Petitioners also contend that we should defer to the EEOC's consistently held position that Title VII applies abroad. We conclude that petitioners' evidence, while not totally lacking in probative value, falls short of demonstrating the affirmative congressional intent required to extend the protections of Title VII beyond our territorial borders.

Title VII prohibits various discriminatory employment practices based on an individual's race, color, religion, sex, or national origin. See §§2000e–2, 2000e–3. An employer is subject to Title VII if it has employed 15 or more employees for a specified period and is "engaged in an industry affecting commerce." An industry affecting commerce is "any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry 'affecting commerce' within the meaning of the Labor-Management Reporting and Disclosure Act of 1959 [(LMRDA)] [29 U. S. C. 401 et seq.]." §2000e(h). "Commerce," in turn, is defined as "trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof; or within the District of Columbia, or a possession of the United States; or between points in the same State but through a point outside thereof." §2000e(g).

Petitioners argue that by its plain language, Title VII's "broad jurisdictional language" reveals Congress' intent to extend the statute's protections to employment discrimination anywhere in the world by a United States employer who affects trade "between a State and any place outside thereof." More precisely, they assert that since Title VII

defines "States" to include States, the District of Columbia, and specified territories, the clause "between a State and any place outside thereof" must be referring to areas beyond the territorial limit of the United States. Reply Brief for Petitioner EEOC 3.

Respondents offer several alternative explanations for the statute's expansive language. They contend that the "or between a State and any place outside thereof" clause "provide[s] the jurisdictional nexus required to regulate commerce that is not wholly within a single state, presumably as it affects both interstate and foreign commerce" but not to "regulate conduct exclusively *within* a foreign country." Brief for Respondents 21, n. 14. They also argue that since the definitions of the terms "employer," "commerce," and "industry affecting commerce" make no mention of "commerce with foreign nations," Congress cannot be said to have intended that the statute apply overseas. In support of this argument, respondents point to Title II of the Civil Rights Act of 1964, governing public accommodation, which specifically defines commerce as it applies to foreign nations. Finally, respondents argue that while language present in the first bill considered by the House of Representatives contained the terms "foreign commerce" and "foreign nations," those terms were deleted by the Senate before the Civil Rights Act of 1964 was passed. They conclude that these deletions "[are] inconsistent with the notion of a clearly expressed congressional intent to apply Title VII extraterritorially." *Id.*, at 7.

We need not choose between these competing interpretations as we would be required to do in the absence of the presumption against extraterritorial application discussed above. Each is plausible, but no more persuasive than that. The language relied upon by petitioners—and it is they who must make the affirmative showing—is ambiguous, and does not speak directly to the question presented here. The intent of Congress as to the extraterritorial application of this

statute must be deduced by inference from boilerplate language which can be found in any number of congressional Acts, none of which have ever been held to apply overseas. See, *e. g.*, Consumer Product Safety Act, 15 U. S. C. § 2052 (a)(12); Federal Food, Drug, and Cosmetic Act, 21 U. S. C. § 321(b); Transportation Safety Act of 1974, 49 U. S. C. App. § 1802(1); Labor-Management Reporting and Disclosure Act of 1959, 29 U. S. C. § 401 *et seq.;* Americans with Disabilities Act of 1990, 42 U. S. C. § 1201 *et seq.*

Petitioners' reliance on Title VII's jurisdictional provisions also finds no support in our case law; we have repeatedly held that even statutes that contain broad language in their definitions of "commerce" that expressly refer to *"foreign* commerce" do not apply abroad. For example, in *New York Central R. Co.* v. *Chisholm,* 268 U. S. 29 (1925), we addressed the extraterritorial application of the Federal Employers' Liability Act (FELA), 45 U. S. C. § 51 *et seq.* FELA provides that common carriers by railroad while engaging in "interstate or foreign commerce" or commerce between "any of the States or territories and any foreign nation or nations" shall be liable in damages to its employees who suffer injuries resulting from their employment. § 51. Despite this broad jurisdictional language, we found that the Act "contains no words which definitely disclose an intention to give it extraterritorial effect," *Chisholm, supra,* at 31, and therefore there was no jurisdiction under FELA for a damages action by a United States citizen employed on a United States railroad who suffered fatal injuries at a point 30 miles north of the United States border into Canada.

Similarly, in *McCulloch* v. *Sociedad Nacional de Marineros de Honduras,* 372 U. S. 10 (1963), we addressed whether Congress intended the National Labor Relations Act (NLRA), 29 U. S. C. §§ 151–168, to apply overseas. Even though the NLRA contained broad language that referred by its terms to foreign commerce, § 152(6), this Court refused to find a congressional intent to apply the statute abroad

because there was not "any specific language" in the Act reflecting congressional intent to do so. *McCulloch, supra,* at 19.

The EEOC places great weight on an assertedly similar "broad jurisdictional grant in the Lanham Act" that this Court held applied extraterritorially in *Steele* v. *Bulova Watch Co.,* 344 U. S. 280, 286 (1952). Brief for Petitioner in No. 89–1838, p. 12. In *Steele,* we addressed whether the Lanham Act, designed to prevent deceptive and misleading use of trademarks, applied to acts of a United States citizen consummated in Mexico. The Act defined commerce as "all commerce which may lawfully be regulated by Congress." 15 U. S. C. § 1127. The stated intent of the statute was "to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce." *Ibid.* While recognizing that "the legislation of Congress will not extend beyond the boundaries of the United States unless a contrary legislative intent appears," the Court concluded that in light of the fact that the allegedly unlawful conduct had some effects within the United States, coupled with the Act's "broad jurisdictional grant" and its "sweeping reach into 'all commerce which may lawfully be regulated by Congress,'" the statute was properly interpreted as applying abroad. *Steele, supra,* at 285, 287.

The EEOC's attempt to analogize these cases to *Steele* is unpersuasive. The Lanham Act by its terms applies to "all commerce which may lawfully be regulated by Congress." The Constitution gives Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U. S. Const., Art. I, § 8, cl. 3. Since the Act expressly stated that it applied to the extent of Congress' power over commerce, the Court in *Steele* concluded that Congress intended that the statute apply abroad. By contrast, Title VII's more limited, boilerplate "commerce" language does not support such an expansive construction of congressional intent. Moreover, unlike

the language in the Lanham Act, Title VII's definition of "commerce" was derived expressly from the LMRDA, a statute that this Court had held, prior to the enactment of Title VII, did not apply abroad. *McCulloch, supra,* at 15.

Thus petitioners' argument based on the jurisdictional language of Title VII fails both as a matter of statutory language and of our previous case law. Many Acts of Congress are based on the authority of that body to regulate commerce among the several States, and the parts of these Acts setting forth the basis for legislative jurisdiction will obviously refer to such commerce in one way or another. If we were to permit possible, or even plausible, interpretations of language such as that involved here to override the presumption against extraterritorial application, there would be little left of the presumption.

Petitioners argue that Title VII's "alien exemption provision," 42 U. S. C. § 2000e–1, "clearly manifests an intention" by Congress to protect United States citizens with respect to their employment outside of the United States. The alien-exemption provision says that the statute "shall not apply to an employer with respect to the employment of aliens outside any State." Petitioners contend that from this language a negative inference should be drawn that Congress intended Title VII to cover United States *citizens* working abroad for United States employers. There is "[n]o other plausible explanation [that] the alien exemption exists," they argue, because "[i]f Congress believed that the statute did not apply extraterritorially, it would have had no reason to include an exemption for a certain category of individuals employed outside the United States." Brief for Petitioner in No. 89–1838, pp. 12–13. Since "[t]he statute's jurisdictional provisions cannot possibly be read to confer coverage only upon aliens employed outside the United States," petitioners conclude that "Congress could not rationally have enacted an exemption for the employment of aliens abroad if it intended to fore-

close *all* potential extraterritorial applications of the statute." *Id.*, at 13.

Respondents resist petitioners' interpretation of the alien-exemption provision and assert two alternative *raisons d'être* for that language. First, they contend that since aliens are included in the statute's definition of employee,* and the definition of commerce includes possessions as well as "States," the purpose of the exemption is to provide that employers of aliens in the possessions of the United States are not covered by the statute. Thus, the "outside any State" clause means outside any State, but within the control of the United States. Respondents argue that "[t]his reading of the alien exemption provision is consistent with and supported by the historical development of the provision" because Congress' inclusion of the provision was a direct response to this Court's interpretation of the term "possessions" in the Fair Labor Standards Act in *Vermilya-Brown Co.* v. *Connell*, 335 U. S. 377 (1948), to include leased bases in foreign nations that were within the control of the United States. Brief for Respondents 27. They conclude that the alien-exemption provision was included "to limit the impact of *Vermilya-Brown* by excluding from coverage employers of aliens in areas under U. S. control that" were not encompassed within Title VII's definition of the term "State." *Id.*, at 29.

Second, respondents assert that by negative implication, the exemption "confirm[s] the coverage of aliens in the United States." *Id.*, at 26. They contend that this inter-

---

*Title VII defines "employee" as:

"an individual employed by an employer, except that the term 'employee' shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office. The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision." 42 U. S. C. § 2000e(f).

pretation is consistent with our conclusion in *Espinoza* v. *Farah Mfg. Co.*, 414 U. S. 86 (1973), that aliens within the United States are protected from discrimination both because Title VII uses the term "individual" rather than "citizen," and because of the alien-exemption provision.

If petitioners are correct that the alien-exemption clause means that the statute applies to employers overseas, we see no way of distinguishing in its application between United States employers and foreign employers. Thus, a French employer of a United States citizen in France would be subject to Title VII—a result at which even petitioners balk. The EEOC assures us that in its view the term "employer" means only "American employer," but there is no such distinction in this statute and no indication that the EEOC in the normal course of its administration had produced a reasoned basis for such a distinction. Without clearer evidence of congressional intent to do so than is contained in the alien-exemption clause, we are unwilling to ascribe to that body a policy which would raise difficult issues of international law by imposing this country's employment-discrimination regime upon foreign corporations operating in foreign commerce.

This conclusion is fortified by the other elements in the statute suggesting a purely domestic focus. The statute as a whole indicates a concern that it not unduly interfere with the sovereignty and laws of the States. See, *e. g.*, 42 U. S. C. § 2000h–4 (stating that the Act should not be construed to exclude the operation of state law or invalidate any state law unless inconsistent with the purposes of the Act); § 2000e–5 (requiring the EEOC to accord substantial weight to findings of state or local authorities in proceedings under state or local law); § 2000e–7 (providing that nothing in Title VII shall affect the application of state or local law unless such law requires or permits practices that would be unlawful under Title VII); §§ 2000e–5(c), (d), and (e) (provisions addressing deferral to state discrimination pro-

ceedings). While Title VII consistently speaks in terms of "States" and state proceedings, it fails even to mention foreign nations or foreign proceedings.

Similarly, Congress failed to provide any mechanisms for overseas enforcement of Title VII. For instance, the statute's venue provisions, § 2000e–5(f)(3), are ill-suited for extraterritorial application as they provide for venue only in a judicial district in the State where certain matters related to the employer occurred or were located. And the limited investigative authority provided for the EEOC, permitting the Commission only to issue subpoenas for witnesses and documents from "any place in the United States or any Territory or possession thereof," 29 U. S. C. § 161, incorporated by reference into 42 U. S. C. § 2000e–9, suggests that Congress did not intend for the statute to apply abroad.

It is also reasonable to conclude that had Congress intended Title VII to apply overseas, it would have addressed the subject of conflicts with foreign laws and procedures. In amending the Age Discrimination in Employment Act of 1967 (ADEA), 81 Stat. 602, as amended, 29 U. S. C. § 621 *et seq.*, to apply abroad, Congress specifically addressed potential conflicts with foreign law by providing that it is not unlawful for an employer to take any action prohibited by the ADEA "where such practices involve an employee in a workplace in a foreign country, and compliance with [the ADEA] would cause such employer . . . to violate the laws of the country in which such workplace is located." § 623(f)(1). Title VII, by contrast, fails to address conflicts with the laws of other nations.

Finally, the EEOC, as one of the two federal agencies with primary responsibility for enforcing Title VII, argues that we should defer to its "consistent" construction of Title VII, first formally expressed in a statement issued after oral argument but before the Fifth Circuit's initial decision in this case, Policy Statement No. N–915.033, BNA EEOC Compliance Manual § 605:0055 (Apr. 1989), "to apply to discrimination against

American citizens outside the United States." Brief for Petitioner in No. 89–1838, p. 22. Citing a 1975 letter from the EEOC's General Counsel, 1983 testimony by its Chairman, and a 1985 decision by the Commission, it argues that its consistent administrative interpretations "reinforce" the conclusion that Congress intended Title VII to apply abroad.

In *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 140–146 (1976), we addressed the proper deference to be afforded the EEOC's guidelines. Recognizing that "Congress, in enacting Title VII, did not confer upon the EEOC authority to promulgate rules or regulations," we held that the level of deference afforded "'will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" *Id.*, at 141, 142 (quoting *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944)).

The EEOC's interpretation does not fare well under these standards. As an initial matter, the position taken by the Commission "contradicts the position which [it] had enunciated at an earlier date, closer to the enactment of the governing statute." *General Electric Co.*, *supra*, at 142. The Commission's early pronouncements on the issue supported the conclusion that the statute was limited to domestic application. See 29 CFR § 1606.1(c) (1971) ("Title VII . . . protects all individuals, both citizen and noncitizens, domiciled or residing in the United States, against discrimination on the basis of race, color, religion, sex, or national origin"). While the Commission later intimated that the statute applied abroad, this position was not expressly reflected in its policy guidelines until some 24 years after the passage of the statute. The EEOC offers no basis in its experience for the change. The EEOC's interpretation of the statute here thus has been neither contemporaneous with its enactment nor consistent since the statute came into law. As discussed above, it also lacks support in the plain language of the stat-

ute. While we do not wholly discount the weight to be given to the 1988 guideline, its persuasive value is limited when judged by the standards set forth in *Skidmore.* Accord, *Southeastern Community College* v. *Davis,* 442 U. S. 397, 411–412 (1979); *SEC* v. *Sloan,* 436 U. S. 103, 117–118 (1978); *Espinoza* v. *Farah Mfg. Co.,* 414 U. S., at 93–94. We are of the view that, even when considered in combination with petitioners' other arguments, the EEOC's interpretation is insufficiently weighty to overcome the presumption against extraterritorial application.

Our conclusion today is buttressed by the fact that "[w]hen it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute." *Argentine Republic* v. *Amerada Hess Shipping Corp.,* 488 U. S. 428, 440 (1989). Congress' awareness of the need to make a clear statement that a statute applies overseas is amply demonstrated by the numerous occasions on which it has expressly legislated the extraterritorial application of a statute. See, *e. g.,* the Export Administration Act of 1979, 50 U. S. C. App. § 2415(2) (defining "United States person" to include "any domestic concern (including any permanent domestic establishment of any foreign concern) and any foreign subsidiary or affiliate (including any permanent foreign establishment) of any domestic concern which is controlled in fact by such domestic concern"); Coast Guard Act, 14 U. S. C. § 89(a) (Coast Guard searches and seizures upon the high seas); 18 U. S. C. § 7 (Criminal Code extends to high seas); 19 U. S. C. § 1701 (Customs enforcement on the high seas); Comprehensive Anti-Apartheid Act of 1986, 22 U. S. C. § 5001(5)(A) (definition of "national of the United States" as "a natural person who is a citizen of the United States . . ."); the Logan Act, 18 U. S. C. § 953 (applying Act to "[a]ny citizen . . . wherever he may be . . ."). Indeed, after several courts had held that the ADEA did not apply overseas, Congress amended § 11(f) to provide: "The term 'employee' includes any individual who is a citizen of the United States em-

ployed by an employer in a workplace in a foreign country." 29 U. S. C. § 630(f). Congress also amended § 4(g)(1), which states: "If an employer controls a corporation whose place of incorporation is in a foreign country, any practice by such corporation prohibited under this section shall be presumed to be such practice by such employer." § 623(h)(1). The expressed purpose of these changes was to "mak[e] provisions of the Act apply to citizens of the United States employed in foreign countries by U. S. corporations or their subsidiaries." S. Rep. No. 98–467, p. 2 (1984). Congress, should it wish to do so, may similarly amend Title VII and in doing so will be able to calibrate its provisions in a way that we cannot.

Petitioners have failed to present sufficient affirmative evidence that Congress intended Title VII to apply abroad. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join the judgment of the Court and its opinion except that portion, *ante,* at 256–258, asserting that the views of the Equal Employment Opportunity Commission—not only with respect to the particular point at issue here but apparently as a general matter—are not entitled to the deference normally accorded administrative agencies under *Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U. S. 837 (1984). The case relied upon for the proposition that the EEOC's interpretations have only the force derived from their "power to persuade" was decided in an era when we were disposed to give deference (as opposed to "persuasive force") only to so-called "legislative regulations." The reasoning of *General Electric Co. v. Gilbert,* 429 U. S. 125 (1976) was not that the EEOC (singled out from other agencies) was not entitled to deference, but that the EEOC's *guidelines,* like the guidelines of all agencies without explicit rulemaking

power, could not be considered legislative rules and therefore could not be accorded deference. See *id.*, at 141.

In an era when our treatment of agency positions is governed by *Chevron,* the "legislative rules vs. other action" dichotomy of *Gilbert* is an anachronism; and it is not even a correct description of that anachronism to say that *Gilbert* held that the EEOC (as opposed to all agency action other than legislative rules) is not entitled to deference. We recognized that only three years ago in *EEOC* v. *Commercial Office Products Co.,* 486 U. S. 107 (1988)—which case, rather than *Gilbert,* was our last word on deference to the EEOC. We said, in language quite familiar from our cases following *Chevron,* that "the EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference." *Id.,* at 115. *Commercial Office Products* has not been overruled (or even mentioned) in today's opinion, so that the state of the law regarding deference to the EEOC is left unsettled.

I would resolve these cases by assuming, without deciding, that the EEOC was entitled to deference on the particular point in question. But deference is not abdication, and it requires us to accept only those agency interpretations that are reasonable in light of the principles of construction courts normally employ. Given the presumption against extraterritoriality that the Court accurately describes, and the requirement that the intent to overcome it be "clearly expressed," it is in my view not reasonable to give effect to mere implications from the statutory language as the EEOC has done. Cf. Sunstein, Law and Administration after *Chevron,* 90 Colum. L. Rev. 2071, 2114 (1990).

On all other points, I join the opinion of the Court.

JUSTICE MARSHALL, with whom JUSTICE BLACKMUN and JUSTICE STEVENS join, dissenting.

Like any issue of statutory construction, the question whether Title VII protects United States citizens from discrimination by United States employers abroad turns solely on congressional intent. As the majority recognizes, our in-

quiry into congressional intent in this setting is informed by the traditional "canon of construction which teaches that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Foley Bros., Inc.* v. *Filardo*, 336 U. S. 281, 285 (1949). But contrary to what one would conclude from the majority's analysis, this canon is *not* a "clear statement" rule, the application of which relieves a court of the duty to give effect to all available indicia of the legislative will. Rather, as our case law applying the presumption against extraterritoriality well illustrates, a court may properly rely on this presumption only after exhausting all of the traditional tools "whereby unexpressed congressional intent may be ascertained." *Ibid.* When these tools are brought to bear on the issue in this case, the conclusion is inescapable that Congress *did* intend Title VII to protect United States citizens from discrimination by United States employers operating overseas. Consequently, I dissent.

I

Because it supplies the driving force of the majority's analysis, I start with "[t]he canon . . . that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Ibid.* The majority recasts this principle as "the need to make *a clear statement* that a statute applies overseas." *Ante*, at 258 (emphasis added). So conceived, the presumption against extraterritoriality allows the majority to derive meaning from various instances of statutory silence—from Congress' failure, for instance, "to mention foreign nations or foreign proceedings," *ante*, at 256, "to provide any mechanisms for overseas enforcement," *ibid.*, or to "addres[s] the subject of conflicts with foreign laws and procedures," *ante*, at 256. At other points, the majority relies on its reformulation of the presumption to avoid the "need [to] choose between . . . competing interpretations" of affirmative statu-

tory language that the majority concludes "does not speak *directly* to the question" of extraterritoriality. *Ante*, at 250 (emphasis added). In my view, the majority grossly distorts the effect of this rule of construction upon conventional techniques of statutory interpretation.

Our most extensive discussion of the presumption against extraterritoriality can be found in *Foley Brothers, supra.* The issue in that case was whether the Eight Hour Law—a statute regulating the length of the workday of employees hired to perform contractual work for the United States—applied to construction projects in foreign nations. After noting "the assumption that Congress is primarily concerned with domestic conditions," the Court concluded that there was "nothing in the Act itself, as amended, nor in the legislative history, which would lead to the belief that Congress entertained any intention other than the normal one in this case." 336 U. S., at 285. The Court put particular emphasis on "[t]he scheme of the Act," including Congress' failure to draw a "distinction . . . therein between laborers who are aliens and those who are citizens of the United States." *Id.,* at 286. "The absence of any [such] distinction," the Court explained, "indicates . . . that the statute was intended to apply only to those places where the labor conditions of both citizen and alien employees are a probable concern of Congress." *Ibid.* The Court also engaged in extended analyses of the legislative history of the statute, see *id.,* at 286–288, and of pertinent administrative interpretations, see *id.,* at 288–290.

The range of factors that the Court considered in *Foley Brothers* demonstrates that the presumption against extraterritoriality is *not* a "clear statement" rule. Clear-statement rules operate less to reveal *actual* congressional intent than to shield important values from an *insufficiently strong* legislative intent to displace them. See, *e. g., Webster* v. *Doe,* 486 U. S. 592, 601, 603 (1988); *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 242–243 (1985); *Kent* v. *Dulles,* 357

U. S. 116, 130 (1958). When they apply, such rules foreclose inquiry into extrinsic guides to interpretation, see, *e. g.*, *Dellmuth* v. *Muth*, 491 U. S. 223, 230 (1989), and even compel courts to select less plausible candidates from within the range of permissible constructions, see, *e. g.*, *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 575 (1988). The Court's analysis in *Foley Brothers* was by no means so narrowly constrained. Indeed, the Court considered the entire range of conventional sources "whereby *unexpressed* congressional intent may be ascertained," 336 U. S., at 285 (emphasis added),[1] including legislative history, statutory structure, and administrative interpretations. Subsequent applications of the presumption against extraterritoriality confirm that we have not imposed the drastic clear-statement burden upon Congress before giving effect to its intention that a particular enactment apply beyond the national boundaries. See, *e. g.*, *Steele* v. *Bulova Watch Co.*, 344 U. S. 280, 286–287 (1952) (relying on "broad jurisdictional grant" to find intention that Lanham Act applies abroad).

The majority converts the presumption against extraterritoriality into a clear-statement rule in part through selective quotation. Thus, the majority reports that the Court in *New York Central R. Co.* v. *Chisholm*, 268 U. S. 29 (1925), declined to construe the Federal Employers' Liability Act to apply extraterritorially because it concluded that the statute " 'contains no words which definitely disclose an intention to give it extraterritorial effect,' " *ante*, at 251, quoting 268 U. S., at 31. The majority omits the remainder of the quoted sentence, which states, "nor do *the circumstances* require an inference of such purpose." 268 U. S., at 31 (emphasis added). Similarly, the majority notes that the Court in *McCulloch* v. *Sociedad Nacional de Marineros de Honduras*, 372 U. S. 10 (1963), did not find " 'any specific language' " in the National

---

[1] The majority quotes this language, see *ante*, at 248, but then proceeds to disregard it completely in the course of its analysis.

Labor Relations Act indicating that Congress expected the statute to apply to foreign-flag ships. *Ante*, at 252, quoting 372 U. S., at 19. The full sentence states: "But, as in *Benz* [v. *Compania Naviera Hidalgo, S. A*, 353 U. S. 138 (1957)], [petitioners] have been unable to point to any specific language in the Act itself *or in its extensive legislative history* that reflects such a congressional intent." 372 U. S., at 19 (emphasis added).

The majority also overstates the strength of the presumption by drawing on language from cases involving a wholly independent rule of construction: "that 'an act of congress ought never to be construed to violate the law of nations if any other possible construction remains . . . .'" *McCulloch* v. *Sociedad Nacional, supra,* at 21, quoting *The Charming Betsy*, 2 Cranch 64, 118 (1804) (Marshall, C. J.); see *Benz* v. *Compania Naviera Hidalgo, S. A.*, 353 U. S. 138, 146–147 (1957). At issue in *Benz* was whether the Labor Management Relations Act of 1947 "applie[d] to a controversy involving damages resulting from the picketing of a foreign ship operated entirely by foreign seamen under foreign articles while the vessel is temporarily in an American port." *Id.*, at 138–139. Construing the statute to apply under such circumstances would have displaced labor regulations that were founded on the law of another nation and that were applicable solely to foreign nationals. *Id.*, at 139, 142, 146. In language quoted in the majority's opinion, see *ante*, at 248, the Court stated that there must be present "the affirmative intention of the Congress clearly expressed" before it would infer that Congress intended courts to enter "such a delicate field of international relations." *Benz, supra,* at 147. Similarly, in *McCulloch*, the Court focused on the absence of "'the affirmative intention of the Congress clearly expressed,'" in declining to apply the National Labor Relations Act to foreign-flag vessels with foreign crews. 372 U. S., at 22, quoting *Benz, supra,* at 147. Extraterritorial application in *McCulloch* would have violated not only "the

well-established rule of international law that the law of the flag state ordinarily governs the internal affairs of a ship," 372 U. S., at 21, but also regulations issued by the State Department, see *id.*, at 20, and n. 11.

Far from equating *Benz* and *McCulloch*'s clear-statement rule with *Foley*'s presumption against extraterritoriality, the Court has until now recognized that *Benz* and *McCulloch* are reserved for settings in which the extraterritorial application of a statute would "implicat[e] sensitive issues of the authority of the Executive over relations with foreign nations." *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500 (1979); see *Weinberger* v. *Rossi*, 456 U. S. 25, 32 (1982) (*McCulloch* rule designed to avoid constructions that raise "foreign policy implications"); *Longshoremen* v. *Ariadne Shipping Co.*, 397 U. S. 195, 198–199 (1970) (declining to follow *Benz* and *McCulloch* in setting in which United States citizens were employed by foreign vessels). The strictness of the *McCulloch* and *Benz* presumption permits the Court to avoid, if possible, the separation-of-powers and international-comity questions associated with construing a statute to displace the domestic law of another nation. See *NLRB* v. *Catholic Bishop of Chicago, supra*, at 500. Nothing nearly so dramatic is at stake when Congress merely seeks to regulate the conduct of United States nationals abroad. See *Steele* v. *Bulova Watch Co., supra*, at 285–286; *Skiriotes* v. *Florida*, 313 U. S. 69, 73–74 (1941).[2]

Because petitioners advance a construction of Title VII that would extend its extraterritorial reach only to United States nationals, it is the weak presumption of *Foley Brothers*, not the strict clear-statement rule of *Benz* and *Mc-*

_____

[2] It is also worth noting that although we have construed *McCulloch* and *Benz* as embodying a clear-statement rule, see *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 500 (1979), the Court in both *Benz*, see 353 U. S., at 142–146, and *McCulloch*, see 372 U. S., at 19, consulted the legislative history of the statutes at issue in those cases before concluding that neither applied to the facts before the Court.

*Culloch,* that should govern our inquiry here.   Under *Foley Brothers,* a court is not free to invoke the presumption against extraterritoriality until it has exhausted all available indicia of Congress' intent on this subject.   Once these indicia are consulted and given effect in this case, I believe there can be no question that Congress intended Title VII to protect United States citizens from discrimination by United States employers abroad.

## II

### A

Title VII states:

> "It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."   42 U. S. C. § 2000e–2(a)(1).

Under the statute, "[t]he term 'employer' means a person engaged in an industry affecting commerce who has fifteen or more employees," § 2000e(b); "[t]he term 'commerce' means trade, traffic, commerce, transportation, transmission, or communication among the several States; or between a State and any place outside thereof. . . ."   § 2000e(g).

These terms are broad enough to encompass discrimination by United States employers abroad.   Nothing in the text of the statute indicates that the protection of an "individual" from employment discrimination depends on the location of that individual's workplace; nor does anything in the statute indicate that employers whose businesses affect commerce between "a State and any other place outside thereof" are exempted when their discriminatory conduct occurs beyond the Nation's borders.   While conceding that it is "plausible" to infer from the breadth of the statute's central prohibition that Congress intended Title VII to apply extraterritorially,

*ante*, at 250, the majority goes to considerable lengths to show that this language is not sufficient to overcome the majority's clear-statement conception of the presumption against extraterritoriality. However, petitioners claim no more—and need claim no more, given additional textual evidence of Congress' intent—than that this language is *consistent* with a legislative expectation that Title VII apply extraterritorially, a proposition that the majority does not dispute.

Confirmation that Congress did *in fact* expect Title VII's central prohibition to have an extraterritorial reach is supplied by the so-called "alien exemption" provision. The alien-exemption provision states that Title VII "shall not apply to an employer with respect to the employment of aliens *outside any State*." 42 U. S. C. § 2000e–1 (emphasis added).[3] Absent an intention that Title VII *apply* "outside any State," Congress would have had no reason to craft this extraterritorial exemption. And because only discrimination against aliens is exempted, employers remain accountable for discrimination against United States citizens abroad.

The inference arising from the alien-exemption provision is more than sufficient to rebut the presumption against extraterritoriality. Compare *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1 (1989). In *Union Gas*, we considered the question whether Congress had stated with sufficient clarity its intention to abrogate the States' Eleventh Amendment immunity under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980. Based on a limited exemption provision directed at the States, we concluded that Congress had spoken with sufficient clarity; absent "a background understanding" that the general terms of the statute had made the States amenable to suit, we explained,

---

[3] For purposes of Title VII, "[t]he term 'State' includes a State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam, Wake Island, the Canal Zone, and Outer Continental Shelf lands defined in the Outer Continental Shelf Lands Act [43 U. S. C. 1331 et seq.]." 42 U. S. C. § 2000e(i).

the limited exemption "would [have] be[en] unnecessary." *Id.*, at 8. If this logic is sufficiently sharp to pierce the dense armor afforded the States by the clear-statement abrogation rule of *Atascadero State Hospital* v. *Scanlon*, 473 U. S., at 242–243; accord, *Dellmuth* v. *Muth*, 491 U. S., at 230, then the same logic necessarily overcomes the much weaker presumption against extraterritoriality recognized in *Foley Brothers*.

The history of the alien-exemption provision confirms the inference that Congress expected Title VII to have extraterritorial application. As I have explained, the Court in *Foley Brothers* declined to construe the Eight Hour Law to apply extraterritorially in large part because of "[t]he absence of any distinction between citizen and alien labor" under the Law:

> "Unless we were to read such a distinction into the statute we should be forced to conclude . . . that Congress intended to regulate the working hours of a citizen of Iran who chanced to be employed on a public work of the United States in that foreign land. . . . An intention so to regulate labor conditions which are the primary concern of a foreign country should not be attributed to Congress in the absence of a clearly expressed purpose." 336 U. S., at 286.

The language comprising the alien-exemption provision first appeared in an employment-discrimination bill introduced only seven weeks after the Court decided *Foley Brothers*, see H. R. 4453, 81st Cong., 1st Sess. (1949), and was clearly aimed at insulating that legislation from the concern that prevented the Court from adopting an extraterritorial construction of the Eight Hour Law. The legislative history surrounding Title VII leaves no doubt that Congress had extraterritorial application in mind when it revived the alien-exemption provision from the earlier antidiscrimination bill:

"In section 4 of the Act, a limited exception is provided for employers with respect to employment of aliens outside of any State . . . . *The intent of [this] exemption is to remove conflicts of law which might otherwise exist between the United States and a foreign nation in the employment of aliens outside the United States by an American enterprise.*" H. R. Rep. No. 570, 88th Cong., 1st Sess. 4 (1963) (emphasis added), reprinted in Civil Rights, Hearings on H. R. 7152, as amended, before Subcommittee No. 5 of the Committee on the Judiciary, 88th Cong., 1st Sess., 2303 (Civil Rights Hearings).[4]

See also S. Rep. No. 867, 88th Cong., 2d Sess., 11 (1964) ("Exempted from the bill are . . . U. S. employers employing citizens of foreign countries *in foreign lands*" (emphasis added)).

Notwithstanding the basic rule of construction requiring courts to give effect to all of the statutory language, see *Reiter* v. *Sonotone Corp.*, 442 U. S. 330, 339 (1979), the majority never advances an alternative explanation of the alien-exemption provision that is consistent with the majority's own conclusion that Congress intended Title VII to have a purely domestic focus. The closest that the majority comes to attempting to give meaning to the alien-exemption provision is to identify without endorsement "two alternative *raisons d'être* for that language" offered by respondents. *Ante*, at 254. Neither of these explanations is even minimally persuasive.

---

[4] The alien-exemption provision was originally part of H. R. 405, 88th Cong., 1st Sess. (1963), reprinted in Civil Rights Hearings, at 2330. This bill, along with others, was incorporated (with amendments immaterial to the alien-exemption provision) into H. R. 7152, the bill that became the Civil Rights Act of 1964. See H. R. Rep. No. 914, 88th Cong. 1st Sess., 57 (1963) (additional views of Rep. Meader). The Committee Report accompanying H. R. 405 was likewise incorporated into the record of committee hearings held on the various bills from which H. R. 7152 derived. See Civil Rights Hearings, at 2300.

The first is the suggestion that the alien-exemption provision indicates, by negative implication, merely that aliens are covered by Title VII if they are employed *in the United States.* This construction hardly makes sense of the statutory language as a whole; indeed, it hardly makes sense. Under respondents' construction of the statute, no one—neither citizen nor alien—is protected from discrimination abroad. Thus, in order to credit respondents' interpretation of the alien-exemption provision, we must attribute to Congress a decision to enact a completely superfluous exemption solely as a means of signaling its intent that aliens be protected from employment discrimination in this Nation. In addition to being extremely improbable, such a legislative subterfuge would have been completely unnecessary, for as we indicated in *Espinoza* v. *Farah Mfg. Co.*, 414 U. S. 86 (1973), Congress clearly communicated its intent to cover aliens working in this country by prohibiting discrimination against "any individual." See *id.,* at 95.

Respondents' second explanation is that Congress included the alien-exemption provision in anticipation that courts would otherwise construe Title VII to apply to companies employing aliens in United States "possessions," an outcome supposedly dictated by this Court's decision in *Vermilya-Brown Co.* v. *Connell*, 335 U. S. 377 (1948). This explanation may very well be true, but it only corroborates the conclusion that Congress expected Title VII to apply extraterritorially. Although there is no fixed legal meaning for the term "possession," see *id.,* at 386, it is clear that possessions, like foreign nations, are extraterritorial jurisdictions to which the presumption against extraterritorial application of a statute attaches. See *Foley Bros., supra,* at 285.[5] Because only one rule of construction applies to both types of jurisdiction, a

---

[5] The presumption was overcome in *Vermilya-Brown* because the legislation at issue in that case *expressly* applied to United States "possessions." See 335 U. S., at 379, 386; see also *Foley Bros.,* 336 U. S. 281, 285 (1949).

court following *Vermilya-Brown* and *Foley Brothers* would have reached the *same* conclusion about the applicability of Title VII to companies employing aliens in possessions and to companies employing aliens in foreign nations. Consequently, if Congress believed that the alien-exemption provision was necessary to protect employers in the former class, it would have had just as much reason to believe that the provision was necessary to protect employers in the latter. In any case, the specific history surrounding the alien-exemption provision makes clear that Congress had the situation of "U. S. employers employing citizens of foreign countries *in foreign lands*" firmly in mind when it enacted that provision. S. Rep. No. 867, *supra*, at 11 (emphasis added).

## B

Rather than attempting to reconcile its interpretation of Title VII with the language and legislative history of the alien-exemption provision, the majority contents itself with pointing out various legislative silences that, in the majority's view, communicate a congressional intent to limit Title VII to instances of domestic employment discrimination. In particular, the majority claims that, had Congress intended to give Title VII an extraterritorial reach, it "would have addressed the subject of conflicts with foreign laws and procedures," *ante*, at 256, and would have "provide[d] . . . mechanisms for overseas enforcement," including special venue provisions and extraterritorial investigatory powers for the Equal Employment Opportunity Commission (EEOC), see *ibid.* The majority also emphasizes Congress' failure to draw an express distinction between extraterritorial application of Title VII to United States employers and extraterritorial application of Title VII to foreign employers. See *ante*, at 255. In my view, none of these supposed omissions detracts from the conclusion that Congress intended Title VII to apply extraterritorially.

The majority is simply incorrect in its claim that Congress disregarded the subject of conflicts with foreign law. Congress addressed this concern by enacting the alien-exemption provision, the announced purpose of which was *"to remove conflicts of law* which might otherwise exist between the United States and a foreign nation in the employment of aliens outside the United States by an American enterprise." H. R. Rep. No. 570, at 4, reprinted in Civil Rights Hearings, at 2303 (emphasis added). As I have explained, the alien-exemption provision is tailored to avert the very type of potential conflict that prevented the Court from construing the Eight Hour Law to apply extraterritorially in *Foley Brothers*. Congress could have gone further in addressing the topic of conflicts, but it is not our position to second-guess the balance struck by Congress in this respect.

The majority also misrepresents the character of Title VII's venue provisions. Title VII provides that venue is proper in various districts related to the underlying charge of discrimination, but also states that

> "if the [employer] is not found within any such district, such an action may be brought within the judicial district in which the [employer] has his principal office." 42 U. S. C. § 2000e–5(f)(3).

"Principal office" venue would extend to any United States employer doing business abroad. Identical language is found in the venue provision of the Jones Act, 46 U. S. C. App. § 688(a), which under appropriate circumstances applies to injuries occurring outside the territorial jurisdiction of the United States, see generally *Hellenic Lines Ltd.* v. *Rhoditis*, 398 U. S. 306, 308–309 (1970).[6]

---

[6] In addition, a United States citizen who suffers employment discrimination abroad may bring a Title VII action against the United States employer in state court, see *Yellow Freight System, Inc.* v. *Donnelly*, 494 U. S. 820 (1990), to which the venue provisions of Title VII clearly would not apply, see *Bainbridge* v. *Merchants & Miners Transp. Co.*, 287 U. S. 278, 280–281 (1932).

Nor can any inference be drawn from the scope of the EEOC's investigatory powers under the statute. Title VII directs the EEOC to conduct an investigation "[w]henever a charge is filed" under the statute, 42 U. S. C. § 2000e–5(b); it also states that the EEOC is to "have access to, for the purposes of examination, and the right to copy any evidence of any person being investigated," § 2000e–8(a). Far from imposing a geographic limitation on either of these powers, Title VII states that the EEOC may "exercise any or all its powers" in the District of Columbia (the site of the EEOC's principal office) or "at *any other place.*" § 2000e–4(f) (emphasis added).

Title VII does limit the reach of the subpoena power of the EEOC, see § 2000e–9; 29 U. S. C. § 161(1), but this limitation does not detract from the potential extraterritorial reach of the agency's investigatory powers. See *FTC* v. *Compagnie De Saint-Gobain-Pont-A-Mousson,* 205 U. S. App. D. C. 172, 194, 636 F. 2d 1300, 1322 (1980) (territorial limitation on subpoena power does not prevent extraterritorial investigations). Moreover, Congress has also declined to give extraterritorial-subpoena power to either the EEOC under the Age Discrimination in Employment Act (ADEA), 29 U. S. C. §§ 209, 626(a); 15 U. S. C. § 49, or to the Securities and Exchange Commission under the Securities Exchange Act of 1934, 15 U. S. C. § 78u(b), even though the former statute expressly applies abroad, 29 U. S. C. §§ 623(h)(1), 630(f),[7] and the latter is widely recognized as doing so, see

---

[7] Congress' amendment of the ADEA to give it extraterritorial application does not reflect a congressional intent that Title VII be confined to domestic application. Congress amended the ADEA in response to lower-court decisions construing the ADEA to apply only domestically. These decisions *distinguished* the ADEA from Title VII in this respect, noting that the former did not contain a provision analogous to the alien-exemption provision. See *Cleary* v. *United States Lines, Inc.,* 728 F. 2d 607, 609 (CA3 1984); see also *Pfeiffer* v. *Wm. Wrigley Jr. Co.,* 755 F. 2d 554, 559 (CA7 1985). Sponsors of the ADEA amendment explained that it would

Turley, "When in Rome": Multinational Misconduct and the Presumption against Extraterritoriality, 84 Nw. U. L. Rev. 598, 613–617 (1990). In short, there simply is no correlation between the scope of an agency's subpoena power and the extraterritorial reach of the statute that the agency is charged with enforcing.

Finally, the majority overstates the importance of Congress' failure expressly to disclaim extraterritorial application of Title VII to foreign employers. As I have discussed, our cases recognize that application of United States law to *United States nationals* abroad ordinarily raises considerably less serious questions of international comity than does the application of United States law to *foreign nationals* abroad. See *Steele* v. *Bulova Watch Co.*, 344 U. S., at 285–286; *Skiriotes* v. *Florida*, 313 U. S., at 73–74. It is the latter situation that typically presents the foreign-policy and conflicts-of-law concerns that underlie the clear-statement rule of *McCulloch* and *Benz*. Because two different rules of construction apply depending on the national identity of the regulated parties, the *same* statute might be construed to apply extraterritorially to United States nationals but *not* to foreign nationals. Compare *Steele* v. *Bulova Watch Co.*, *supra*, at 285–287 (applying Lanham Act to United States national for conduct abroad) with *Vanity Fair Mills, Inc.* v. *T. Eaton Co.*, 234 F. 2d 633, 642–643 (CA2) (declining to apply Lanham Act to foreign national for conduct abroad), cert. denied, 352 U. S. 871 (1956). Cf. *Webster* v. *Doe*, 486 U. S., at 599–601, 603 (finding language in judicial-review statute to have different meanings depending on applicability of different rules of construction).

The legislative history of Title VII, moreover, furnishes direct support for such a construction. See H. R. Rep. No. 570, at 4 (explaining that alien-exemption provision applies to "employment of aliens outside the United States by *an*

---

make the ADEA and Title VII coextensive in their extraterritorial reach. See 129 Cong. Rec. 34499 (1983) (statement of Sen. Grassley).

*American enterprise"* (emphasis added)), reprinted in Civil Rights Hearings, at 2303; S. Rep. No. 867, at 11 (alien-exemption provision directed at *"U. S. employers* employing citizens of foreign countries in foreign lands" (emphasis added)); see also EEOC Policy Statement No. 125, BNA EEOC Compliance Manual 605:0061 (April 1989) (construing nationality of employer abroad to be "significant" under Title VII). Thus, although the issue is not before us in this case, we would not be at a loss for interpretive resources for narrowing Title VII's extraterritorial reach to United States employers should such a construction be necessary in order to avoid conflicts with foreign law.

## III

The extraterritorial application of Title VII is supported not only by its language and legislative history but also by pertinent administrative interpretations. See *Foley Bros.,* 336 U. S., at 288. Since 1975, the EEOC has been on record as construing Title VII to apply to United States companies employing United States citizens abroad:

> "Section [2000e–2(a)(1)] provides that it is unlawful to discriminate against 'any individual' with respect to his employment. . . . The only exception to 'any individual' appears to be that contained in Section [2000e–1], i. e., aliens working outside the U. S. and to employees of certain religious and educational institutions.

> "Giving Section [2000e–1] its normal meaning would indicate a Congressional intent to exclude from the coverage of the statute aliens employed by covered employers working in the employers' operations outside of the United States.

> "The reason for such exclusions is obvious; employment conditions in foreign countries are beyond the control of Congress. The section does not similarly exempt from the provisions of the Act, U. S. Citizens employed abroad by U. S. employers. If Section [2000e–1] is to

have any meaning at all, therefore, it is necessary to construe it as expressing a Congressional intent to extend the coverage of Title VII to include employment conditions of citizens in overseas operations of domestic corporations at the same time it excludes aliens of the domestic corporation from the operation of the statute." Letter from W. Carey, EEOC General Counsel, to Senator Frank Church (Mar. 14, 1975), reprinted in App. 48–49.

The agency has reiterated this interpretation in various decisions and policy pronouncements since then. See, *e. g.*, EEOC Dec. No. 85–16 (Sept. 16, 1985), 38 FEP Cases 1889, 1891–1892; EEOC Policy Statement No. 125, *supra*, at 605:005 to 605:0057. "[I]t is axiomatic that the ÉEOC's interpretation of Title VII, for which it has primary enforcement responsibility, need not be the best one by grammatical or any other standards. Rather, the EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference." *EEOC* v. *Commercial Office Products Co.*, 486 U. S. 107, 115 (1988).

In this case, moreover, the EEOC's interpretation is reinforced by the long-standing interpretation of the Department of Justice, the agency with secondary enforcement responsibility under Title VII. See *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421, 465–466 (1986) (plurality opinion) (deference owed Department of Justice interpretation of Title VII). Stating the position of the Department, then-Assistant Attorney General Scalia testified before Congress:

"With respect to discrimination in employment by private companies and individuals, Title VII of the 1964 Civil Rights Act, as amended, prohibits a broad range of 'unlawful employment practices' by any private employer 'engaged in any industry affecting commerce who has fifteen or more employees.' . . . Once again the [statute] contains an exemption 'with respect to the employment of aliens outside any State,' which implies that it is

applicable to the employment of United States citizens by covered employers anywhere in the world." Foreign Investment and Arab Boycott Legislation, Hearings before the Subcommittee on International Finance of the Senate Committee on Banking, Housing and Urban Affairs, 94th Cong., 1st Sess., 165 (1975).

The majority offers no response to the view of the Department of Justice. It discounts the force of the EEOC's views on the ground that the EEOC has been inconsistent. The majority points to a 1970 EEOC regulation in which the agency declared that "Title VII of the Civil Rights Act of 1964 protects all individuals, both citizen and noncitizens, domiciled or residing in the United States, against discrimination on the basis of race, color, religion, sex, or national origin." 29 CFR § 1606.1(c) (1971). According to the majority, the inconsistency between § 1606.1(c) and the EEOC's 1975 pronouncement deprives the latter of persuasive force. See *ante*, at 257.

This conclusion is based on a misreading of § 1606.1(c). Obviously, it does not follow from the EEOC's recognition that Title VII applies to "both citizens and noncitizens, domiciled or residing in the United States" that the agency understood Title VII to apply to *no one outside* the United States. The context of the regulation confirms that the EEOC meant no such thing. The agency promulgated § 1606.1 in order to announce its interpretation of Title VII's ban on national-origin discrimination. See §§ 1606.1(a)–(b), (d). The agency emphasized that Title VII "protects all individuals, both citizens and noncitizens, domiciled or residing in the United States" only to underscore that neither the citizenship nor the residency status of an individual affects this statutory prohibition. Indeed, the EEOC could not have stated that Title VII protects "both citizens *and* noncitizens" from national-origin discrimination *outside* the United States because such an interpretation would have been inconsistent with the alien-exemption provision. At the very time that

§ 1606.1 was in effect, the EEOC was representing to Congress that Title VII did protect United States citizens from discrimination by United States employers abroad. See Letter from William A. Carey, EEOC General Counsel, *supra*, at 275–276. The majority's insistence that the EEOC was contradicting itself fails to give the agency the deference that it is due on the interpretation of its own regulations. See *Udall* v. *Tallman*, 380 U. S. 1, 16–17 (1965).

In sum, there is no reason not to give effect to the considered and consistently expressed views of the two agencies assigned to enforce Title VII.

## IV

In the hands of the majority, the presumption against extraterritoriality is transformed from a "valid approach whereby unexpressed congressional intent may be ascertained," *Foley Bros.*, 336 U. S., at 285, into a barrier to any genuine inquiry into the sources that reveal Congress' actual intentions. Because the language, history, and administrative interpretations of the statute all support application of Title VII to United States companies employing United States citizens abroad, I dissent.