UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 05-1054
(CA-04-1947-WMN)

In Re: BETTY I. FRENCH,

Debtor,

--------------------------

RANDY LEE FRENCH; DONNA MARIE SHAKA,

Appellants,

versus

GEORGE W. LIEBMANN,

Trustee - Appellee.

O R D E R

The court amends its opinion filed February 14, 2006, as follows:

On the cover sheet, the second sentence of the disposition section is corrected to read:

"Judge Motz wrote the opinion, in which Judge Wilkinson and Judge Michael joined."

For the Court

/s/ Patricia S. Connor
_____
Clerk

**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

In Re: BETTY I. FRENCH,
                                   *Debtor.*

RANDY LEE FRENCH; DONNA MARIE
SHAKA,                                         No. 05-1054
                              *Appellants,*

                  v.

GEORGE W. LIEBMANN,
                   *Trustee-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(CA-04-1947-WMN)

Argued: November 29, 2005

Decided: February 14, 2006

Before WILKINSON, MICHAEL, and MOTZ, Circuit Judges.

---

Affirmed by published opinion. Judge Motz wrote the opinion, in
which Judge Wilkinson and Judge Michael joined. Judge Wilkinson
wrote a separate concurring opinion.

---

### COUNSEL

Stanton J. Levinson, Silver Spring, Maryland, for Appellants. Orbie
R. Shively, GEORGE W. LIEBMANN, P.A., Baltimore, Maryland,
for Appellee.

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This appeal presents the question of whether a United States bankruptcy court can avoid a constructively fraudulent transfer of foreign real property between United States residents. The transferees here argue that the presumption against extraterritoriality and the doctrine of international comity preclude application of the Bankruptcy Code. Both the bankruptcy court and the district court rejected these arguments and allowed avoidance. For the reasons that follow, we affirm.

I.

In 1976, Betty Irene French, a resident of Maryland, purchased a house in the Bahamas. At a Christmas party held in Maryland in 1981, she gave a deed of gift to the Bahamian property to her children, Randy Lee French, a resident of Maryland, and Donna Marie Shaka, a resident of Virginia (hereinafter "the transferees"). Assertedly to avoid high Bahamian transfer taxes, the transferees decided not to immediately record the deed in the Bahamas.

In the late 1990s, Mrs. French and her husband began experiencing serious financial problems. Concerned by this downturn, the transferees decided at last to record the deed in the Bahamas, a task they accomplished through a Bahamian attorney in mid-2000. In October 2000, Mrs. French's creditors filed an involuntary Chapter 7 bankruptcy petition against her. The bankruptcy court entered an Order for Relief on January 29, 2001.

On August 22, 2002, the bankruptcy trustee, George W. Liebmann, filed an adversary proceeding against the transferees to avoid the transfer of the Bahamian property and to recover the property or its fair market value for the benefit of the estate.[1] In his complaint, the trustee alleged (in pertinent part) that the debtor and the transferees

---

[1] As required by the Bankruptcy Code, 11 U.S.C. § 548(d)(1) (2000), all the parties consider the transfer in question to have taken place with the recordation of the deed in 2000, not with the transfer of the deed of gift in 1981.

had engaged in a constructively fraudulent transfer, as defined by the Bankruptcy Code, because the debtor had been insolvent at the time of the transfer and had received less than a reasonably equivalent value in exchange. *See* 11 U.S.C. § 548(a)(1)(B) (2000).

The transferees conceded that the debtor never received a reasonably equivalent value for her gift of the Bahamian property, and they further conceded that the debtor was insolvent in 2000, when the deed was recorded. These facts would normally be sufficient to establish constructive fraud.

Nevertheless, the transferees filed a motion to dismiss before the bankruptcy court based on two grounds. First, they invoked the presumption against extraterritoriality, contending that because of it § 548 should not apply to transfers of foreign property. Second, they maintained that considerations of international comity counseled the application of Bahamian (rather than United States) bankruptcy law, which assertedly would allow the transferees to retain the Bahamian property.

The bankruptcy court rejected the transferees' arguments and denied their motion to dismiss. *Liebmann v. French (In re French)*, 303 B.R. 774 (Bankr. D. Md. 2004). The trustee then moved for summary judgment, which the bankruptcy court granted by finding the transfer to be constructively fraudulent; the district court affirmed. *French v. Liebmann (In re French)*, 320 B.R. 78 (D. Md. 2004). The transferees noted a timely appeal.

## II.

"It is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) [hereinafter *Aramco*] (quoting *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285 (1949)). However, courts only apply this presumption against extraterritoriality when a party seeks to enforce a statute "beyond the territorial boundaries of the United States." *Id.*; *see also Kollias v. D & G Marine Maint.*, 29 F.3d 67, 72 (2d Cir. 1994). The presumption has no bearing when "the conduct which Congress seeks to regulate

occurs largely within the United States" — that is, when regulated conduct is domestic rather than extraterritorial. *Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993). Thus, before deciding how the presumption affects the interpretation of a given statute, a court should consider whether the presumption applies at all. Both parties have treated the application of § 548 to the transfer here as extraterritorial. This assumption may not be warranted.

This court has never defined when conduct is extraterritorial for purposes of the presumption. We have recognized, however, that a similar inquiry — defining "foreign conduct" — is particularly challenging in cases (like this one) that involve a "mixture of foreign and domestic elements." *Dee-K Enters., Inc. v. Heveafil Sdn. Bhd.*, 299 F.3d 281, 286 (4th Cir. 2002).

In this case too, we believe that any definition must eschew rigid rules in favor of a more flexible inquiry into the "place" of regulated conduct. Minimal contact with the United States should not automatically render conduct domestic. *See Gushi Bros. Co. v. Bank of Guam*, 28 F.3d 1535, 1538 (9th Cir. 1994); *Kollias*, 29 F.3d at 72; *Maxwell Commc'n Corp. PLC v. Societe Generale PLC (In re Maxwell Commc'n Corp.)*, 186 B.R. 807, 817 (S.D.N.Y. 1995) [hereinafter *Maxwell II*]. Nor should minor contact with another country suffice to render conduct extraterritorial. *See Massey*, 986 F.2d at 531-32; *Maxwell Commc'n Corp. PLC v. Societe Generale PLC (In re Maxwell Commc'n Corp.)*, 170 B.R. 800, 809 (Bankr. S.D.N.Y. 1994) ("Not every transaction that has a foreign element represents an extraterritorial application of our laws."); Jay Westbrook, *The Lessons of Maxwell Communications*, 64 Fordham L. Rev. 2531, 2538 (1996). To avoid these extremes, we have held for purposes of the Sherman Antitrust Act that, in determining whether conduct is "foreign" or "domestic," "a court should consider whether the participants, acts, targets, and effects involved" in the transaction at issue "are primarily foreign or primarily domestic." *Dee-K Enters.*, 299 F.3d at 294. We think that an equally flexible test taking into account "all component events of the transfer[ ]," *Maxwell II*, 186 B.R. at 816, is appropriate to determine whether an allegedly fraudulent transfer occurred extraterritorially.

In this case, the perpetrator and most of the victims of the fraudulent transfer — all except a single Bahamian creditor — have long

been located in the United States. Given these facts, the effects of this transfer were (naturally) felt most strongly here, and not in the Bahamas.

We also find it significant that the conduct constituting the constructive fraud occurred in the United States. Section 548 defines a constructively fraudulent transfer, *inter alia*, as one where (1) the debtor was insolvent, and (2) the debtor received "less than a reasonably equivalent value in exchange." 11 U.S.C. § 548(a)(1)(B); *see also In re GWI PCS 1 Inc.*, 230 F.3d 788, 805 (5th Cir. 2000). Here, domestic facts and conduct establish both elements. The determination of Mrs. French's insolvency relies almost entirely upon a comparison of domestic debts and assets. And the decision not to provide a "reasonably equivalent value" for the transfer was made in the United States as well — whether we consider the relevant decision to be Mrs. French's gift of the deed in 1981, or the transferees' recordation of the deed in 2000.

However, we recognize that two aspects of this transfer indisputably involve foreign facts and conduct. The first is relatively insignificant: the transferees' Bahamian lawyer recorded their deed to the property in the Bahamas. The physical place where the deed was recorded is at most "incidental" to the actual conduct proscribed by § 548. *See Gushi Bros.*, 28 F.3d at 1538-39. Moreover, although the act of recordation necessarily took place abroad, the transferees themselves may well have been located in the United States both when they decided to record the deed and when they arranged for the Bahamian lawyer's services (the record is not clear on this point).

More importantly, the transferees emphasize that the real property at issue in this case is located in the Bahamas. At first blush, this fact does not seem critical because § 548 focuses not on the property itself, but on the fraud of transferring it. In this case, the facts underlying the fraud occurred here. However, the law has long recognized the powerful interest that states and nations have in the real property within their boundaries; the strength of that interest explains why the law of the situs generally applies to real property. *See, e.g.*, *Oakey v. Bennett*, 52 U.S. 33, 44-45 (1850); *Robinson v. Campbell*, 16 U.S. 212, 219 n.a (1818); Restatement (Second) of Conflict of Laws § 223 comm. b (1974); *cf.* Robby Alden, Note, *Modernizing the Situs Rule*

*for Real Property Conflicts*, 65 Tex. L. Rev. 585, 591-98 (1986-1987) (summarizing arguments on the importance of the location of real property); *but cf. Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. ___, 2006 WL 151985, at *8 (Jan. 23, 2006) ("[The] exercise [of bankruptcy jurisdiction] does not, in the usual case, interfere with state sovereignty even when States' interests are affected.").

Given this long history, the fact that application of United States law could affect Bahamian real property, however indirectly, perhaps merits special weight in the balancing test. The parties in this case certainly seem to believe so — from the outset both sides have treated § 548's reach as extraterritorial. Here, we need not resolve this slippery question. This is so because even if we assume that the application of the Bankruptcy Code would be extraterritorial, the presumption against extraterritoriality does not prevent its application to the transfer at issue here.

III.

Although the presumption against extraterritoriality is important to "protect against unintended clashes between our laws and those of other nations which could result in international discord," it nevertheless must give way when Congress exercises its undeniable "authority to enforce its laws beyond the territorial boundaries of the United States." *Aramco*, 499 U.S. at 248. Thus, whether a given statutory provision should be given extraterritorial effect is a question of congressional intent; there must be the "'affirmative intention of the Congress clearly expressed'" to apply the provision abroad. *Id.* (quoting *Benz v. Compania Naviera Hidalgo, S.A.*, 353 U.S. 138, 147 (1957)). To determine whether Congress has expressed such an affirmative intention, courts may look to "all available evidence," *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 177 (1993), including the text of the statute, the overall statutory scheme, and legislative history. *See Smith v. United States*, 507 U.S. 197, 201-03 & n.4 (1993); *Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 285-88 (1949); *United States v. Gatlin*, 216 F.3d 207, 212 (2d Cir. 2000). In this case, several indicia of congressional intent rebut the presumption against extraterritoriality.

Pursuant to § 541 of the Bankruptcy Code, all of a debtor's property, whether domestic or foreign, is "property of the estate" subject

to the bankruptcy court's *in rem* jurisdiction. *See Hong Kong & Shanghai Banking Corp., Ltd. v. Simon (In re Simon)*, 153 F.3d 991, 996 (9th Cir. 1998) [hereinafter *Simon*]. Section 541 defines the property of the estate broadly as all property "wherever located." 11 U.S.C. § 541(a) (2000). This phrase first appeared in the Bankruptcy Code in 1952; Congress explained that the amendment "make[s] clear that a trustee in bankruptcy is vested with the title of the bankrupt in property which is located without, as well as within, the United States." H.R. Rep. No. 82-2320, at 15 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1960, 1976. Thus, "property of the estate" includes both foreign and domestic property.

Section 541 defines "property of the estate" as, *inter alia*, all "interests of the debtor in property." 11 U.S.C. § 541(a)(1). In turn, § 548 allows the avoidance of certain transfers of such "interest[s] of the debtor in property." 11 U.S.C. § 548(a)(1). By incorporating the language of § 541 to define what property a trustee may recover under his avoidance powers, § 548 plainly allows a trustee to avoid any transfer of property that *would have been* "property of the estate" prior to the transfer in question — as defined by § 541 — even if that property is not "property of the estate" *now*.[2] *Cf. Begier v. IRS*, 496

---

[2] The circuits are divided as to whether "property of the estate" encompasses property that a debtor has fraudulently transferred. If it does — as the Fifth Circuit has held, *see Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1417 (5th Cir. 1997); *Am. Nat'l Bank v. MortgageAmerica Corp. (In re MortgageAmera Corp.)*, 714 F.2d 1266, 1275 (5th Cir. 1983) — then the Bahamian property here falls squarely within § 541's definition of "property of the estate," and that provision's clear incorporation of foreign property would obviously rebut the presumption against extraterritoriality. However, not every court has agreed with the Fifth Circuit's conclusion that "property of the estate" includes property that could be, but has not yet been, recovered as the object of a fraudulent transfer. Instead, other courts have concluded that property held by third-party transferees only becomes "property of the estate" *after* it has been avoided and recovered. *See In re Saunders*, 101 B.R. 303, 304-05 (Bankr. N.D. Fla. 1989); *see also FDIC v. Hirsch (In re Colonial Realty Co.)*, 980 F.2d 125, 131 (2d Cir. 1992); *Dunes Hotel Assocs. v. Hyatt Corp.*, 245 B.R. 492, 504-05 (D.S.C. 2000). Because we hold that § 548 applies to the transfer in this case even assuming that § 541's definition of "property of the estate" does not by itself extend to the Bahamian property, we need not join this dispute.

U.S. 53, 58, 59 n.3 (1990) (reaching a similar conclusion about another avoidance provision, § 547 of the Bankruptcy Code); *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1416 (5th Cir. 1997) ("These § 541 'property of the estate' definitions have been directly linked with the term 'interest of the debtor in property' under § 547(b)."). Through this incorporation, Congress made manifest its intent that § 548 apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located.

This interpretation fully accords with the purpose of the Bankruptcy Code's avoidance provisions, which is to prevent debtors from illegitimately disposing of property that should be available to their creditors. *See Palmer & Palmer, P.C. v. U.S. Tr. (In re Hargis)*, 887 F.2d 77, 79 (5th Cir. 1989) (avoidance provisions "protect[ ] the rights of creditors via protection of the bankruptcy estate"); *see also* Unif. Fraudulent Transfer Act § 3 comm. 2, 7A U.L.A. 295 (1984) ("[T]he purpose of the Act [is] to protect a debtor's estate from being depleted to the prejudice of the debtor's unsecured creditors").

In furtherance of this purpose, Congress provided that creditors are entitled to the "interests of the debtor in property" under § 541 — expressly including all property "wherever located" — and that they may avoid a debtor's fraudulent transfer of the same "interest[s] of the debtor in property" under § 548. Congress thus demonstrated an affirmative intention to allow avoidance of transfers of foreign property that, but for a fraudulent transfer, would have been property of the debtor's estate. Therefore, the presumption against extraterritoriality does not prevent application of § 548 here.

IV.

The transferees argue, however, that even if the presumption against extraterritoriality does not prevent extension of § 548 to the transaction here, we should nevertheless refrain from applying the statute under the doctrine of international comity. In particular, they emphasize that disputes concerning real property should be governed by the law of the situs — here, Bahamian law. We disagree. Even if the elements of this transfer do not conclusively render it domestic rather than extraterritorial, a consideration of all the important compo-

nents of the transfer certainly compels the conclusion that application of the United States Bankruptcy Code is appropriate here.

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). Although there is some dispute as to the precise contours of this doctrine — *compare Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 798 (1993), *with id.* at 813 (Scalia, J., dissenting) — at base comity involves the recognition that there are circumstances in which the application of foreign law may be more appropriate than the application of our own law. In this case, the transferees maintain that application of Bahamian bankruptcy law, which (according to them) only allows avoidance if there is proof of an actual intent to defraud, is more appropriate than application of § 548, which allows avoidance of constructively fraudulent transfers like the one at issue here.

In deciding whether to forego application of our own law under the doctrine of international comity, the Supreme Court has referred to the factors in Restatement (Third) of Foreign Relations Law § 403 (1987). *See Hartford Fire Ins.*, 509 U.S. at 799 & n.25; *id.* at 818 (Scalia, J., dissenting); *see also Maxwell Commc'n Corp. PLC v. Societe Generale PLC (In re Maxwell Commc'n Corp.)*, 93 F.3d 1036, 1047-48 (2d Cir. 1996) [hereinafter *Maxwell III*]. The Restatement looks to, *inter alia*, "the extent to which the activity takes place within the territory" of the regulating state, "the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated," "the extent to which other states regulate such activities" or "may have an interest in regulating [them]," the "likelihood of conflict with regulation by another state," and "the importance of regulation to the regulating state." Restatement (Third), *supra*, § 403(2). Applying those factors, we can only conclude that the doctrine of international comity does not require that we forego application of the United States Bankruptcy Code in favor of Bahamian bankruptcy law.

The strongest argument in favor of applying Bahamian law is that this case involves real property, which (the transferees argue) should

be governed by the law of the situs. When a case involves the definition of property interests, principles of international comity may, in some cases, counsel courts to employ the property law of the situs to resolve those interests, notwithstanding other comity factors. *See Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc. (In re Koreag, Controle et Revision S.A.)*, 961 F.2d 341, 349 (2d Cir. 1992).[3] But analogous modern choice-of-law principles recognize that the law of the situs does not necessarily govern "the allocation of interests in land [between] . . . debtor and creditor" if "regulation of the relationship is of greater concern to a state other than the situs." Restatement (Second) of Conflict of Laws ch. 9, topic 2, introductory note. This is "particularly" true "when the land is part of an aggregate of property which it is desirable to deal with as a unit." *Id.*

Both of these factors are present in this case. The real property at issue is part of an aggregate — the bankruptcy debtor's estate — that is most desirably dealt with as a whole. *Cf. Katz*, 546 U.S. ___, 2006 WL 151985, at \*10 (noting that the origins of the Bankruptcy Clause and the earliest bankruptcy legislation enacted by Congress show that "the Framers' primary goal was to prevent competing sovereigns' interference with the debtor's discharge"). Furthermore, the United States has a stronger interest than the Bahamas in regulating this transaction. The purpose of the United States Bankruptcy Code is to protect the rights of both debtors and creditors during insolvency. *See Philips v. Congelton, L.L.C. (In re White Mountain Mining Co.)*, 403 F.3d 164, 169 (4th Cir. 2005) (quoting 1 *Collier on Bankruptcy*

---

[3] The transferees' citation to *Kojima v. Grandote Int'l L.L.C. (In re Grandote Country Club Co., Ltd.)*, 252 F.3d 1146 (10th Cir. 2001), does not support their contention that there is a *per se* rule that the law of the situs governs questions of fraudulent transfers. In that case, the trustee in a Japanese bankruptcy proceeding brought an ancillary proceeding in Colorado to avoid an allegedly fraudulent transfer of Colorado real property that had been made in Colorado. The Tenth Circuit held that Colorado law rather than Japanese law should determine the fraudulence of the transfer. *Id.* at 1150. But the transfer at issue in *Grandote* was no ordinary transfer; rather, it was so deeply enmeshed with Colorado tax law that the Tenth Circuit deemed the transfer to have been made by the state of Colorado, not by the debtor. *Id.* at 1148-49, 1151-52. Colorado thus had a much stronger connection to the property in question, justifying the application of local law.

¶ 3.02[2] (15th ed. rev. 2005)). The Code protects debtors by providing them a fresh start. *See Foley & Lardner v. Biondo (In re Biondo)*, 180 F.3d 126, 130 (4th Cir. 1999). In exchange, the Code's avoidance provisions protect creditors by preserving the bankruptcy estate against illegitimate depletions. *See Hargis*, 887 F.2d at 79. The United States has a strong interest in extending these personal protections to its residents — including the vast majority of the interested parties here. The Bahamas, by contrast, has comparatively little interest in protecting nonresidents. *Cf. Hurtado v. Superior Court*, 522 P.2d 666, 670 (Cal. 1974) (holding that Mexico has no interest in applying its statutory limitation on damages when defendants in a tort action were not Mexican residents). Thus, applying Bahamian law here would undercut the purpose of the United States Bankruptcy Code by withdrawing its protections from those it is intended to cover, while simultaneously failing to protect any Bahamian residents.

Several other factors make application of United States law more appropriate. Most of the activity surrounding this transfer took place in the United States. Moreover, almost all of the parties with an interest in this litigation — the debtor, the transferees, and all but one of the creditors — are based in the United States, and have been for years. *Compare Maxwell III*, 93 F.3d at 1051 (deference to British law is appropriate when all of the parties were British). Certainly, Mrs. French, "the person principally responsible for the activity to be regulated," has a strong connection to this country as a long-time United States resident. Finally, there are no parallel insolvency proceedings taking place in the Bahamas. There is thus no danger that the avoidance law of the regulating state — the United States — will in fact conflict with Bahamian avoidance law. *See Simon*, 153 F.3d at 999. Accordingly, we find that the many contacts between this fraudulent transfer and the United States justify the application of United States rather than Bahamian law.

## V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.

WILKINSON, Circuit Judge, concurring:

The unique properties of bankruptcy law compel an affirmance of the district court. The bankruptcy laws provide an integrated scheme for gathering and disbursing the assets of a debtor's estate. *See, e.g., Grady v. A.H. Robins Co.*, 839 F.2d 198, 202 (4th Cir. 1988). The Code anticipates that this will take place within a single proceeding, rather than asset by asset in inefficient piecemeal litigation. Indeed, a major purpose of the Bankruptcy Code is to forestall "a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *Underwood v. Hilliard* (*In re Rimsat, Ltd.*), 98 F.3d 956, 961 (7th Cir. 1996) (internal quotation marks omitted); *see also* 5 *Collier on Bankruptcy* ¶ 541.01 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2005) (explaining that the "central aggregation of property . . . promotes the effectuation of the fundamental purposes of the Bankruptcy Code"). Ease and centrality of administration are thus foundational characteristics of bankruptcy law.

For these reasons, Congress has broadly defined property of the estate as property "wherever located and by whomever held." 11 U.S.C. § 541(a) (2000). This broad definition reflects congressional support for the Code's extraterritorial application in appropriate circumstances. *See Hong Kong & Shanghai Banking Corp. v. Simon* (*In re Simon*), 153 F.3d 991, 996 (9th Cir. 1998). The fraudulent transfer provision, 11 U.S.C. § 548(a) (2000), is part and parcel of Congress's overarching objective to aggregate assets. Allowing this constructively fraudulent transfer from the debtor to her children would impair the orderly administration of the bankruptcy estate. I can hardly believe, therefore, that Congress wanted us to excise § 548(a) — and this provision alone — from the remainder of the Bankruptcy Code. And it is unlikely that Congress would desire to accord an invariable exemption from the Code's operation to those who leave our borders to engage in fraud. This is particularly true where, as here, the debtor, the transferees, and virtually every creditor are located in the United States.

My colleague's careful opinion leaves intact the Supreme Court's strong presumption against extraterritorial application of congressional statutes. *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248

(1991) (*Aramco*); *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949). Bankruptcy is, in general, materially different from those provisions held not to apply extraterritorially, such as anti-discrimination statutes, *see Aramco*, 499 U.S. at 248 (Title VII); *Reyes-Gaona v. N.C. Growers Ass'n*, 250 F.3d 861, 864-65 (4th Cir. 2001) (Age Discrimination in Employment Act), or hourly wage laws, *see Foley Bros.*, 336 U.S. at 285. In those contexts, ease of administration is not a raison d'être, and congressional intent for extraterritorial application is considerably less clear. *See also* Curtis A. Bradley & Jack L. Goldsmith, *Foreign Relations Law* 528 (2003) (noting that courts have treated bankruptcy law with special consideration in the extraterritoriality context). The special context of bankruptcy law, therefore, provides little occasion to set forth general pronouncements on extraterritoriality.

Quite properly, the panel opinion also does not suggest that every portion of the Bankruptcy Code invariably applies to conduct abroad. Instead, it represents a sensitive recognition of the administrative exigencies that are bound up with the avoidance of this fraudulent transfer. I agree with this view, and I am happy to join in Judge Motz's fine opinion.