In re Substantively Consolidated Bankruptcy Estates of MIDLAND EURO EXCHANGE INC.; Midland Euro, Inc.; Midland Group Inc.; Moshe Leichner and Zvi Leichner, Debtors.

Christopher R. Barclay, as trustee of the herein Substantively Consolidated Bankruptcy Estates of Midland Euro Exchange, Inc., Midland Euro, Inc., Midland Group, Inc., Moshe Leichner, and Zvi Leichner, Plaintiff,

v.

Swiss Finance Corporation Limited, aka Swiss Finance Corporation, a foreign company; and Does 1–10, Inclusive, Defendants.

Bankruptcy No. SV 03–13981–GM, SV 03–13982–AG, SV 03–13986–AG, SV 03–13987–AG, SV 03–13989–AG. Adversary No. AD 05–01381–GM.

United States Bankruptcy Court, C.D. California, San Fernando Valley Division.

Aug. 16, 2006.

Christopher Barclay, Trustee LECG, LLC, Costa Mesa, CA, Chapter 7 Trustee.

Leonard I. Gumport, Aleksandra Zimonjic, Gumport | Reitman, Los Angeles, CA, for Christopher Barclay, Chapter 7 Trustee.

## MEMORANDUM OF OPINION RE MOTION TO DISMISS PURSUANT TO F.R.C.P. 12(b)(6)

GERALDINE MUND, Bankruptcy Judge.

### I. INTRODUCTION

This action is one of many proceedings stemming from a massive Ponzi scheme run in Southern California between 1999 and 2003. The complaint alleges that be-

ginning in 1999, Midland Euro, Inc. (MEI), Midland Euro Exchange, Inc. (MEEI), Midland Group, Inc. (MGI), and other related entities (collectively "the Debtor" or "Midland Entities") were used by their founders, owners, and principals—Moshe and Zvi Leichner ("the Leichners")—to collect money from investors all over the world with a promise of extraordinary returns from trades in the foreign exchange market. Instead, later proceeds were diverted to repay earlier investors.

The scheme unraveled in 2003. Moshe and Zvi Leichner each pleaded guilty to felony fraud and money-laundering charges and were sentenced to twenty years and eleven years in federal prison, respectively, and a restitution judgment of $98 million.[1] On May 8, 2003, involuntary Chapter 7 bankruptcy petitions were filed against the Leichners and the Midland Entities. By the bankruptcy court's order entered on May 16, 2003, the Debtors' Estates were substantively consolidated. Thereafter, on June 18, 2003, a Chapter 7 Trustee was appointed by the Court. As of today, proofs of claim totaling more than $100 million have been filed against the Estate, including millions of dollars owed to investors.

This adversary proceeding is an attempt by the Trustee to set aside and recover allegedly fraudulent transfers of at least $897,000 paid by the Debtor in fees and commissions to a foreign exchange brokerage—Swiss Financial Corporation, Ltd. (SFC).

## II. PROCEDURAL HISTORY

On June 16, 2005, the Trustee filed a complaint against SFC pleading two claims for relief under 11 U.S.C. § 548(a)(1)(A)

and 11 U.S.C. § 550(a) and seeking to recover fraudulent transfers of at least $897,000. Thereafter, on June 12, 2006, SFC filed a motion to dismiss the complaint for failure to state a claim for relief. The motion was made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, as made applicable by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. The motion also argued that Congress did not intend 11 U.S.C. § 548[2] to apply extraterritorially and that the Court should abstain from exercising jurisdiction over this action on the grounds of international comity.

The Trustee filed his opposition to the motion to dismiss on July 5, 2006, asserting that sufficient facts have been pleaded to overcome the motion to dismiss. With respect to 11 U.S.C. § 548, the Trustee argued that Congress intended to extend its reach extraterritorially, that at least one circuit court reached the same conclusion, and that holding otherwise would create a loophole in the Bankruptcy Code by creating the means for unscrupulous debtors to conceal their assets abroad and therefore outside the reach of the U.S. bankruptcy system. In addition, the Trustee asserted that the facts pleaded in the complaint fall within the exception to the presumption against extraterritoriality and that the international comity doctrine should not prevent this Court from exercising its jurisdiction.

On July 12, 2006, SFC filed its reply to the Trustee's opposition. A hearing was held on July 19, 2006. Based on the motions filed with the Court and the information provided at the hearing, and for the reasons that follow, I am granting the

---

**1.** *United States v. Moshe Leichner and Zvi Leichner,* U.S.D.C. No. CR 03–568, U.S. District Court for the Central District of California.

**2.** Unless otherwise specified, all references to statutes are to 11 United States Code.

motion to dismiss without leave to amend. This memorandum constitutes my findings of fact and conclusions of law with regard to the legal sufficiency of the Trustee's complaint.

### III. STANDARD OF REVIEW

In addressing a motion to dismiss pursuant to F.R.C.P. 12(b)(6), as made applicable by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, this Court is limited to reviewing the facts pleaded in the complaint. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). For the purposes of this motion, all allegations of material fact in the complaint are taken as true and construed in the light most favorable to the nonmoving party. *See, e.g., Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir.1995).

### IV. STATEMENT OF FACTS

#### A. The Trustee's Complaint

For the purposes of this motion, the facts pleaded in the Trustee's complaint are uncontroverted. The complaint alleges that MGI was a Barbados corporation set up by the Leichners in December 2000 to hold title to proceeds of the Ponzi scheme. (Complaint ¶ 15). To create an aura of legitimacy and to be able to market itself as a successful currency trader, MGI contacted SFC in or about May 2002, requesting to open a foreign exchange trading account. (¶ 23). At the time, SFC was a foreign exchange brokerage formed under the laws of England and headquartered in London. (¶ 5).

SFC conducted an investigation of the Debtor in order to ascertain its true financial condition prior to opening a margin trading account (permitting the Debtor to trade on credit). (¶ 24). As part of the investigation, SFC communicated with the Leichners in Los Angeles County, California and learned that the Leichners were the principals of MGI. (¶¶ 23—24).

Upon discovering that the Leichners were the principals of MGI, SFC knew or consciously avoided knowledge of "serious and substantial legal and financial problems" involving the Leichners and companies they controlled. (¶¶ 25—26). Specifically, SFC learned the following facts:

1. Moshe Leichner was insolvent beginning no later than 1998 and there were unsatisfied judgments of at least $100,000 against him. (¶ 8).

2. Moshe Leichner filed a bankruptcy petition in the U.S. Bankruptcy Court for the Central District of California on or about June 22, 1998, which was dismissed without a discharge. (¶ 9).

3. In March 2000, the California Department of Corporations issued a cease and desist order against Zvi Leichner and Midland Euro Exchange Trust (MEET). (¶ 14).

4. There was a judgment in the amount of $800,000 against Zvi Leichner in litigation entitled *Rawashdeh v. Mansour, et. al.*, Case No. BC 191035 in the Los Angeles County Superior Court. (¶ 17). The complaint alleged causes of action for, among other things, fraud and breach of fiduciary duty arising out of the defendants' operation of a foreign currency trading business. (¶ 17).

5. There was a lawsuit filed in the Los Angeles County Superior Court on or about October 9, 2001, to recover $16 million from the Leichners, Midland Euro, Inc. (MEI), and Midland

Euro Exchange, Inc. (MEEI) for breach of contract, conversion, and fraud. (¶ 18). The lawsuit was entitled *Al Baraka Intl. Investment Co., Ltd. v. Midland Euro Exchange, Inc., et al.*, L.A.S.C. No. BC 259482. (¶ 18). A preliminary injunction against MEI and MEEI, restricting them from transferring assets, was issued in November 2001. (¶ 22).

6. On or about October 31, 2001, the National Futures Association ("NFA"), a self-regulatory organization of which MEI was a member, suspended MEI's membership in NFA "to protect MEI's customers." (¶ 19). A publicly available declaration submitted by the NFA described false and/or deceitful financial conduct committed by MEI and its management. (¶ 19).

7. On or about November 19, 2001, the United States Commodity Futures Trading Commission (the "CFTC") announced its intention to suspend or restrict MEI's registration with the CFTC as a futures merchant. (¶ 20).

The Trustee further contends that in May 2002, despite knowing or consciously avoiding knowledge of these widespread legal and regulatory actions against the Leichners and their companies (MEI, MEEI, and MEET), SFC decided to open a trading account for MGI in order to profit from the proposed $1 million deposit and subsequent trading fees (¶ 26). On May 22, 2002, the Debtor made a wire transfer of $1 million from MEEI's Lloyds Bank account in London to SFC's HSBC Bank USA account in New York. (¶ 27). From New York, the deposit was transferred by SFC to an unspecified bank account in England.

Thereafter, from approximately May 22, 2002 until shortly before the May 8, 2003 involuntary bankruptcy filings, the Debtor conducted currency trades in the SFC account. (¶ 29). The exact nature of these trades is not described in the complaint and is being disputed by the parties. At the hearing, SFC stated that it acted as a bona fide middleman connecting third parties interested in taking opposite sides in trading on currency fluctuations. It took a small fee for its services. The Trustee disagreed, claiming that SFC took an active position in at least some of the trades, and effectively engineered a casino-like trading system where the only party that could potentially profit from the trades was SFC. I need not resolve this dispute because, regardless of how the trading operated, the parties agree that SFC transferred $897,000 from MGI's initial $1 million deposit and whether it was to cover SFC's fees and commissions (according to SFC) or profits (according to the Trustee) (¶ 29) is not relevant to this motion.

## B. The Trustee's Claims

The Trustee is seeking to set aside and recover the allegedly fraudulent transfers of at least $897,000 under two provisions of the U.S. Bankruptcy Code—11 U.S.C. § 548 and § 550—which provide in relevant part:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted. § 548(a)(1)(A).

And,

> The trustee may recover, for the benefit of the estate, the property transferred,

or, if the court so orders, the value of such property, from:

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee. § 550(a).

### C. SFC's Motion to Dismiss

SFC's motion to dismiss and its reply to the Trustee's opposition, filed on June 12 and July 12, 2006, correspondingly, argue that the complaint should be dismissed on three independent grounds.

First, SFC asserts that the complaint fails to state a claim because it is missing specific facts to show that SFC acted in bad faith in accepting the transfer from the Debtor. SFC contends that bad faith of the transferee is an affirmative element of the Trustee's *prima facie* case.

Second, SFC argues that Congress did not intend to apply the fraudulent transfer provisions of § 548 extraterritorially. According to SFC, the conduct in question occurred outside the territorial borders of the United States and absent a clear indication of congressional intent to the contrary, a presumption against extraterritoriality bars application of the statute to foreign entities and transactions.

Finally, SFC contends that the doctrine of international comity should lead the Court to abstain from exercising its jurisdiction in this matter. According to the declaration submitted by SFC, the U.S. and English laws conflict. Under English law, fraudulent intent on the part of the transferee must be shown. Under U.S. law, the transferee can be liable without a showing of actual fraudulent intent. Given that the laws conflict, that the "center of gravity" of the transaction was in England, and that England has an interest in having its own laws applied to transactions on its

territory, SFC is asking the Court to abstain from exercising the jurisdiction it otherwise has. I will consider the merits of each of these arguments in turn.

### V. DISCUSSION

#### A. Failure to State a Claim

■ SFC's first argument for dismissal is that while the Trustee has pleaded a Ponzi scheme, he also needs to plead enough facts to prove that SFC did not act in good faith in receiving the transfers. (SFC Motion, p. 14–15). SFC cites *In re Agricultural Research Technology Group, Inc.*, 916 F.2d 528, 535 (9th Cir.1990), in support of the proposition that in order for the Trustee to recover, "the defendant must have knowledge or actual notice of circumstances sufficient to put the transferee upon inquiry as to whether the debtor intended to delay or defraud its creditors." (SFC Motion, p. 15).

■ SFC's interpretation of what needs to be proven to state a fraudulent transfer claim is inaccurate and the quote above is taken out of context. *In re Agricultural Research* stands for the proposition that the defendant's knowledge of the debtor's intent to defraud creditors might be sufficient to prove that the defendant acted in bad faith; it does not imply that lack of good faith is part of the *prima facie* showing the Trustee needs to make in order to prove his case. Indeed, the opposite is true, as many courts have acknowledged: good faith is an affirmative defense available to SFC. *See* Collier on Bankruptcy ¶ 548.10 (15th Ed. rev.2006) (stating that section 548 is based on the Uniform Fraudulent Conveyance Act); *In re Cohen*, 199 B.R. 709, 719 (9th Cir. BAP 1996) ("The issue of good faith under UFTA § 8(a) is a defensive matter as to which the defendants asserting the existence of good faith have the burden of proof"); *In*

*re Candor Diamond Corp.*, 76 B.R. 342, 349 n. 4 (Bankr.S.D.N.Y.1987) (holding that transferee's intent is only relevant for the purposes of a good faith defense and is not part of the trustee's *prima facie* case to recover fraudulent transfers pursuant to 11 U.S.C. § 548). Therefore, under § 548(a)(1)(A), the essential elements of the *prima facie* fraudulent transfer case are that within less than one year prior to the bankruptcy filing, the Debtor made a transfer of its property to SFC with actual intent to hinder, delay, or defraud the debtor's creditors.

■ SFC agrees that the Trustee properly pleaded that the Debtor was engaged in running a Ponzi scheme. (SFC Motion, p. 14). The mere existence of the Ponzi scheme is sufficient to prove the Debtor's actual intent to hinder, delay, or defraud its creditors. *See In re Agricultural Research*, 916 F.2d at 535 (citing *Conroy v. Shott*, 9 Ohio Misc. 117, 363 F.2d 90, 92 (6th Cir.1966); *In re Indep. Clearing House Co.*, 77 B.R. 843, 860 (D.Utah 1987)); *In re Old Naples Securities, Inc.*, 343 B.R. 310, 319 (Bankr.M.D.Fla.2006) ("Proof of a Ponzi scheme by itself establishes actual intent to hinder, delay, or defraud creditors."). Per the complaint, Midland Entities filed for bankruptcy on May 8, 2003 and the alleged transfers occurred between May 22, 2002 and May 8, 2003, within one year of the filing. Therefore, the Trustee properly pleaded a *prima facie* case of fraudulent transfers under 11 U.S.C. § 548.

### B. Presumption Against Extraterritoriality

■ SFC's second argument is that failure to dismiss the Trustee's complaint would result in extraterritorial application of § 548, which is contrary to congressional intent as expressed by the plain language of the statute. It is a long-settled principle of American law "that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *See In re Maxwell Commc'n Corp.*, 170 B.R. 800, 809 (Bankr.S.D.N.Y. 1994) (citing *Equal Employment Opportunity Comm'n v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991)).

The parties agree that allowing the Trustee to proceed with his claims would result in extraterritorial application of § 548. The transferor was a Barbados corporation, the transferee was an English corporation, the funds originated from a bank account in London and, although transferred through a bank account in New York, eventually ended up in another bank account in England.

Whether Congress intended to extend the reach of the fraudulent transfer statute extraterritorially is a matter of great practical concern for the parties. If the extraterritorial application of § 548 is upheld, the Trustee would be able to recover from SFC by merely proving the existence of a Ponzi scheme and the fact that the transfers actually occurred. Otherwise, the Trustee will not only face the logistical difficulties of bringing the suit in England, but he will also have to prove, under British law, that SFC had actual knowledge of the Midland Entities' scheme to defraud its creditors.

### C. Exception to the Presumption Against Extraterritoriality

■ Prior to analyzing the presumption against extraterritorial application of the statute, I must address the Trustee's contention that the presumption does not apply here because the "regulated conduct" was "intended to, and resulted in, substantial effects within the United States." *See In re Simon*, 153 F.3d 991, 995 (9th Cir. 1998) (citing *Laker Airways, Ltd. v. Sabe-*

*na Belgian World Airlines,* 731 F.2d 909, 925 (D.C.Cir.1984)). The Trustee argues that this exception applies because SFC knew or reasonably should have known that the allegedly fraudulent transfer was part of a larger criminal scheme concocted by the Leichners for the sole purpose of defrauding American creditors, hiding stolen assets, and avoiding the reach of U.S. regulators. According to the Trustee, if proven, such knowledge is strongly corroborative of SFC's intent to interfere with U.S. regulatory authorities and falls within the exception to the presumption against extraterritoriality.

The Trustee's reading of the exception is misguided. Keeping in mind that this is a Rule 12(b)(6) motion to dismiss, the question the Court must address is whether the facts pleaded in the complaint, taken as true and construed in the light most favorable to the Trustee, are sufficient to establish that "regulated conduct" was "intended to, and resulted in, substantial effects within the United States." The focus of the exception is on the conduct itself—the allegedly fraudulent transfer—and not on the knowledge and intent of the transferee in accepting the funds. Second, the exception only applies to "regulated conduct," a concept that neither party has addressed.

■ Black's Law Dictionary defines "regulation" as "1. The act or process of controlling by rule or restriction <the federal regulation of the airline industry> . . . 3. A rule or order, having legal force, usu. issued by an administrative agency <Treasury regulations explain and interpret the Internal Revenue Code>." From that, it can be inferred that "regulated conduct" is the "act or process" controlled by either judicial or administrative rule or restriction. Previous applications of the exception reflect this interpretation. In *Laker Airways,* foreign airlines engaged in anticompetitive behavior that was heavily reg-

ulated by the U.S. antitrust statutes. In *In re Simon,* a foreign creditor attempted to pursue collection abroad of a debt discharged in a domestic bankruptcy in violation of the injunction issued by the court.

These decisions are clearly distinguishable from the facts of the Trustee's case. The transfers to SFC occurred prior to the filing of the bankruptcy petition, and, with a single exception discussed below, were not subject to any rulings or regulations of the U.S. courts or administrative agencies. Thus the conduct was not "regulated," and the exception does not apply.

The only fact pleaded in the complaint that could trigger this exception is the injunction issued by the Los Angeles County Superior Court in November 2001 against one of the Leichners' companies— MEEI—restricting it from transferring assets. SFC allegedly disregarded the injunction by accepting a $1 million transfer from MEEI's bank account in London. Transfer in violation of the injunction constitutes "regulated conduct." However, the question this Court must address is whether the violation qualifies as a "substantial" effect. *See Consolidated Gold Fields PLC v. Minorco, S.A.,* 871 F.2d 252, 262 (2nd Cir.1989) ("In determining whether certain effects qualify as 'substantial,' courts have been reluctant to apply our laws to transactions that have only remote and indirect effects in the United States"). While none of the cases the Court had an opportunity to review discusses what qualifies as a "substantial" effect, the facts here certainly do not add up to one.

■ Some general guidelines the Courts have considered in measuring "substantiality" are the number of people impacted by the defendant's conduct, the dollar amount of damages caused, and the scale of disruption in U.S. commercial activity. In *Laker Airways,* for instance, several foreign airlines conspired to engage in anti-

competitive behavior that drove a discount U.S. airline—Laker Airways—out of business. At the time, Laker was carrying one out of every seven scheduled air passengers between the United States and England. The anti-competitive behavior affected hundreds of Laker's employees and thousands of passengers. Laker suffered multi-million-dollar damages and the U.S. public was forced to pay higher prices for transatlantic travel. In *Laker Airways,* the Court found it "beyond dispute" that antitrust laws governed foreign airlines' behavior because they intended to, and their actions resulted in, substantial effects within the United States. *Laker Airways,* 731 F.2d at 925. In SFC's case, on the other hand, the effects of the alleged injunction violation are not "substantial." There is only the plaintiff in the injunction suit who was injured by SFC's conduct, the damages are comparatively insignificant, and the impact on the U.S. commerce in general is *de minimis.* The Trustee did not meet his burden of proof and the exception to the presumption against extraterritoriality does not apply.

### D. Extraterritorial Application of 11 U.S.C. § 548

 Next, the Court needs to address whether Congress intended universal extraterritorial application of the fraudulent transfer provisions codified in § 548. This is an issue of first impression in the Ninth Circuit, with a split of opinion in the other circuits and a petition for writ of certiorari pending with the Supreme Court, asking, *inter alia,* to clarify congressional intent on this issue. Most recently, the Fourth Circuit upheld extraterritorial application of § 548. *See In re French,* 440 F.3d 145 (4th Cir.2006), *cert. petition pending,* —— U.S. —— (filed May 15, 2006). A bankruptcy court in the Second Circuit, however, dealing with the Trustee's avoidance power under the similar preferential trans-

fer statute—11 U.S.C. § 547—held that the lack of clearly expressed congressional intent prevents its extraterritorial application. *See In re Maxwell Comm'n. Corp.,* 170 B.R. 800, 814 (Bankr.S.D.N.Y.1994), *aff'd on other grounds, In re Maxwell,* 93 F.3d 1036 (2nd Cir.1996).

 The starting point in statutory construction is the language of the statute itself. Nothing in the text of § 548 indicates congressional intent to apply it extraterritorially.

Next, the Court looks at other sections of the Bankruptcy Code to see if they shed light on congressional intent. *See United Savings Ass'n v. Timbers of Inwood Forest Associates,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme—because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

It was suggested that § 548 read in conjunction with § 541 of the Code demonstrates congressional intent to apply § 548 extraterritorially. Section 541 provides that "property of the estate" includes property "wherever located and by whomever held." There is a split among circuits on whether "property of the estate" includes property that could be, but has not yet been, recovered as the object of a fraudulent transfer. *See In re French,* 440 F.3d at 151–2, n. 2. The majority of the courts have concluded that property held by third-party transferees only becomes "property of the estate" after the transfer has been avoided. *See id.* (citing *In re Saunders,* 101 B.R. 303, 304–05 (Bankr. N.D.Fla.1989); *FDIC v. Hirsch (In re Colonial Realty Co.),* 980 F.2d 125, 131 (2d

Cir.1992); *Dunes Hotel Assocs. v. Hyatt Corp.*, 245 B.R. 492, 504–05 (D.S.C.2000)); *but see id.* (citing *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1417 (5th Cir.1997); *Am. Natl. Bank v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1275 (5th Cir.1983)).

■ I need not address the intricacies of this dispute. Suffice it to say that the Fifth Circuit's approach in *Criswell* to what constitutes "property of the estate" is susceptible to criticisms well articulated in other courts' decisions. I find the reasoning of the majority more logical and defensible. Thus, I hold that allegedly fraudulent transfers do not become property of the estate until they are avoided.

Since neither the plain language of the statute nor its reading in conjunction with other parts of the Code establish congressional intent to apply § 548 extraterritorially, I now turn to other considerations.

### E. Policy

In interpreting the statute, the Court must first draw a line between advancing the policy goals of the bankruptcy system and interpreting indicia of congressional intent. It is undeniable that policy considerations favor extraterritorial application of 11 U.S.C. § 548. The efficacy of the bankruptcy proceeding depends on the court's ability to control and marshal the assets of the debtor *wherever located. In re Simon*, 153 F.3d at 996 (quoting *In re Rimsat*, 98 F.3d 956, 961 (7th Cir.1996)) (emphasis added). Failure to extend application of § 548 to transfers outside the territorial borders of the United States creates a loophole for unscrupulous debtors to freely transfer their assets to shell entities abroad and avoid the reach of the Bankruptcy Code. *See, generally,* David M. Green and Walter Benzija, *Spanning the Globe: The Intended Extraterritorial Reach of the Bankruptcy Code,* 10 Am.

Bankr.Inst. L.Rev. 85, 86–7 (2002) (advocating extraterritorial application of the U.S. Bankruptcy Code on policy grounds).

■ These policy considerations, however, must be balanced against the presumption against extraterritoriality, which serves to protect against unintended clashes between our laws and those of other nations which could result in international discord. *See E.E.O.C. v. Arabian American Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991). The Ninth Circuit has held that policy considerations alone are insufficient to overcome the presumption against extraterritoriality. *See Subafilms, Ltd. v. MGM–Pathe Communications Co.*, 24 F.3d 1088, 1096 (9th Cir.1994) (en banc) ("...the ultimate touchstone of extraterritoriality consist[s] of an ascertainment of congressional intent; courts [do] not rest solely on the consequences of a failure to give a statutory scheme extraterritorial application.").

### F. Fourth Circuit's Recent Decision

Prior to the Fourth Circuit's decision in *In re French*, no court had ever held that Congress intended extraterritorial application of § 548. The Trustee advocates the adoption of the holding in *In re French* by this Court. The problem with the conclusion reached by the Fourth Circuit is that it requires the Court to make a logical leap that I am not prepared to make.

The analysis in *In re French* starts with two correct premises: (1) § 541(a)(1) defines "property of the estate" as, *inter alia*, all "legal or equitable interests of the debtor in property as of the commencement of the case" and (2) § 548 allows the avoidance of certain transfers of such "interest[s] of the debtor in property." Based on this, the Fourth Circuit reaches the following conclusion: "By incorporating the language of § 541 to define what

property a trustee may recover under his avoidance powers, § 548 plainly allows a trustee to avoid any transfer of property that *would have been* 'property of the estate' prior to the transfer in question—as defined by § 541—even if that property is not 'property of the estate' now." *See In re French,* 440 F.3d at 151. (emphasis in the original).

■ This reasoning apparently presumes that the debtor retains a "legal or equitable" interest in the property transferred pre-petition, or to paraphrase, that "property of the estate" includes property transferred but not yet recovered. It ignores the language in § 541(a)(1) and (a)(3) that the debtor must have an interest in the property "as of the commencement of the case" and that property of the estate includes "any interest in property that the trustee *recovers* under section... 550 ... of this title." (emphasis added). When the plain meaning of the language of the statute is clear, the courts need only enforce it. This statute seems very clear to any ordinary reader: property that has been fraudulently transferred only becomes property of the estate when the transfer has been set aside.

■ Even if these provisions do not meet the plain meaning test, to read them as was done by the Fifth Circuit in *In re Criswell,* 102 F.3d 1411, 1416 (5th Cir. 1997) (cited by the Fourth Circuit in support of its decision in *In re French*), is to violate a maxim of statutory interpretation that holds that the court should attempt to give meaning and effect to every word, clause and section of a statute. See *Chickasaw Nation v. U.S.,* 534 U.S. 84, 93, 122 S.Ct. 528, 151 L.Ed.2d 474 (2001) (citing *U.S. v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 99 L.Ed. 615 (1955)). While the maxims of statutory interpretation are not mandatory rules, in the case of § 541(a)(1)

and (a)(3), they do help to clarify what Congress intended.

*In re French* totally ignores § 541(a)(3) and uses an unclear and convoluted method to reach its conclusion. I have a great deal of trouble following the Fourth Circuit's reasoning and am not persuaded that it leads to the proper conclusion. Thus I find no basis for holding that Congress intended the trustee's avoiding powers to apply extraterritorially.

Perhaps the true reason the Fourth Circuit extended application of § 548 extraterritorially lies in the next paragraph, which acknowledges that such "interpretation fully accords with the purposes of the Bankruptcy Code's avoidance provisions, which is to prevent debtors from illegitimately disposing of property that should be available to their creditors." *See In re French,* 440 F.3d at 152. However, as noted above, the Ninth Circuit does not view policy considerations alone as valid grounds for overcoming the presumption against extraterritoriality. *See Subafilms,* 24 F.3d at 1096 ("...the ultimate touchstone of extraterritoriality consist[s] of an ascertainment of congressional intent; courts [do] not rest solely on the consequences of a failure to give a statutory scheme extraterritorial application."). Therefore, since I can find no evidence of congressional intent to extend the application of § 548 extraterritorially, the Trustee may not pursue his claims against SFC under this statute.

### G. International Comity

■ SFC's third argument for dismissal is based on the doctrine of international comity. Under this doctrine, courts sometimes defer to the laws or interests of a foreign country and decline to exercise the jurisdiction they otherwise have. *See Mujica v. Occidental Petroleum Corp.,* 381 F.Supp.2d 1134, 1155 (C.D.Cal.2005). "In the legal sense, comity: is neither a matter

720

of absolute obligation, on the one hand, nor of mere courtesy and good will, on the other." *In re Simon*, 153 F.3d at 998. "But it is a recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience and to the rights of its own citizens or of other persons who are under the protection of its laws." *Id.*

SFC urges the Court to dismiss the Trustee's complaint because U.S. and English fraudulent transfer laws lead to conflicting outcomes; because the "center of gravity" of the transaction is in England; and because England has greater interest in adjudicating this dispute. Given the Court's holding that § 548 does not apply extraterritorially, I need not reach the substance of this argument.

## VI. CONCLUSION

The Trustee's complaint to avoid and recover fraudulent transfers in the amount of at least $897,000 is hereby dismissed without leave to amend pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, as made applicable in bankruptcy by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. The Trustee properly pleaded a *prima facie* case under 11 U.S.C. § 548. However, I can not find any evidence that would elucidate congressional intent to broadly extend application of the fraudulent transfer provisions of the Bankruptcy Code outside the territorial borders of the United States. Absent such indicia of congressional intent, the presumption against extraterritoriality bars application of the statute to a foreign transfer.

The Court recognizes that its decision does nothing to close the loophole in the Bankruptcy Code that allows dishonest debtors to avoid the reach of the U.S. bankruptcy system by hiding the assets abroad. At the same time, Congress is the ultimate arbiter of the laws it enacts and it has the power to alter the language of the statute to clearly manifest its intent. This is particularly so given that Congress recognizes the need to verbalize its intent in order to overcome the presumption against extraterritoriality. In 1952 Congress amended section 541 of the Code to define property of the estate as all property "wherever located." *See In re French*, 440 F.3d at 151. In passing the amendment, Congress explained that the amendment "make[s] clear that a trustee in bankruptcy is vested with the title of the bankrupt in property which is located without, as well as within, the United States." *See id.* (quoting H.R.Rep. No. 82–2320, at 15 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1960, 1976). In light of such a clearly-worded amendment to another section of the Bankruptcy Code and the exception in § 541(a)(3) to property which has not yet been recovered under the trustee's strong-arm powers, the only logical interpretation of congressional silence with respect to 11 U.S.C. § 548 is that the presumption against extraterritoriality must stand.