**UNITED STATES of America**

v.

**Osama Esam Saleem AYESH, Defendant.**

**No. 1:10cr388.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Jan. 28, 2011.

---

David H. Laufman, Thomas H. McQuillan, United States Attorney's Office, Alexandria, VA, for Plaintiff.

Aamra S. Ahmad, Office of the Federal Public Defender, Alexandria, VA, for Defendant.

### MEMORANDUM OPINION

T.S. ELLIS, III, District Judge.

Defendant, Osama Esam Saleem Ayesh, is charged in a two count indictment with abusing his position at the United States Embassy in Baghdad, Iraq to steal and to convert to his own use $243,615 belonging to the United States, in violation of 18 U.S.C. §§ 641 and 208(a). He seeks threshold dismissal of the indictment on jurisdictional grounds, arguing that this prosecution is an impermissible exercise of

extraterritorial jurisdiction inasmuch as all the charged conduct occurred outside the United States and neither § 641 nor § 208 can be applied extraterritorially.

This matter, which has a somewhat involved history, has been fully briefed and argued and is now ripe for resolution.[1]

## I.

During the period of time relevant to the indictment, 2008–2010, defendant, a primary resident of Jordan, was employed by the Department of State and assigned to the United States Embassy in Baghdad, Iraq ("USEB") as a shipping and customs supervisor when he allegedly abused his USEB position to convert $243,416 from the United States. As a USEB shipping and customs supervisor, defendant was responsible for facilitating shipments of personal property belonging to USEB personnel into and out of Iraq, including ensuring that these items cleared customs. The process of clearing Iraqi customs was typically coordinated by an experienced local vendor with whom USEB contracted, and defendant's role was to oversee and to assist the vendor on behalf of USEB. Each vendor with whom USEB contracted for services generally operated pursuant to a Blanket Purchase Agreement ("BPA") with USEB. To receive payment for services, each vendor was required to submit a Wire Transfer Payment Instruction Form ("WTPIF") specifying the vendor's bank account. When payment was re-

quired, money was wired from a U.S. government bank account to the account specified by the vendor in the WTPIF.

Two BPAs are relevant to the charges against defendant. Both BPAs involve the same local vendor, Sukar Al–Zubaidi Company ("SZC"), which USEB engaged for "Delivery Services and Customs Clearance." The first BPA was identified as SIZ100–08–A–0628 and dated September 11, 2008. After several months of operating under this BPA, the $100,000 ceiling established in the BPA was reached, and thus, on May 12, 2009, USEB entered into a second BPA with SZC, identified as SIZ100–09–A–0496. On each of these BPAs, defendant was identified as one of two "BPA callers," meaning that defendant was authorized to contact SZC and to arrange for services on behalf of USEB.

The indictment alleges that defendant used his position as an intermediary between USEB and SZC to divert funds intended for SZC to a Jordanian bank account controlled by his wife. He did so, according to the government, by setting up a fictitious email address, "co.alzubaidi@ yahoo.com," which defendant led USEB officials to believe belonged to SZC. But the government alleges that in fact, defendant controlled this email account and was responsible for all "correspondence" between his Department of State email address and his fictitious SZC email address. Using this fake email address, defendant

---

1. Shortly after the arraignment, defendant filed a *pro se* motion to dismiss for lack of jurisdiction, and on the same day, defendant's former counsel, the federal public defender, also filed a motion to dismiss on the same grounds. Subsequently, defendant's *pro se* motion to appoint new counsel was granted. *See United States v. Ayesh*, No. 1:10cr388 (E.D.Va. Dec. 17, 2010) (Order). Because new counsel had not had an opportunity to brief the jurisdictional issue, resolution of the motions to dismiss on jurisdictional grounds were deferred to allow new counsel an oppor-

tunity to file a supplemental brief on the jurisdiction issue. *See United States v. Ayesh*, No. 1:10cr388 (E.D.Va. Jan. 6, 2010) (Order). Defendant's counsel submitted a supplemental filing, and consequently, all arguments tendered by the defense—including the arguments in defendant's *pro se* motion, the motion to dismiss brought by defendant's original counsel, the supplemental memorandum filed by defendant's new counsel, and oral arguments—have been considered in the resolution of the motions.

allegedly submitted a WTPIF supposedly drafted by SZC in which defendant identified SZC's bank account as an account that, in reality, was controlled by defendant's wife. As a result, wire transfers were made from U.S. government bank accounts—not to SZC—but to an account allegedly controlled by and accessible to defendant. USEB officials eventually discovered discrepancies related to the BPAs, and an investigation revealed numerous incriminating emails sent by defendant.

Once defendant's scheme was discovered, agents from the FBI and the Department of State Office of the Inspector General began a comprehensive, but covert investigation. Following the issuance of an arrest warrant for defendant, USEB officials lured defendant to the United States by telling him that he was being selected for participation in a training program to be conducted in the United States. When defendant arrived at Dulles International Airport, he was promptly arrested, and soon thereafter indicted.

The three count indictment may be briefly summarized. Count I charges that from approximately November 2008 to April 2009, defendant "did knowingly embezzle, steal, purloin, and convert to his use $116,105 in U.S. Government electronic funds" intended for the payment of services under BPA SIZ100–08–A–0628 but instead transferred to a Jordanian bank account controlled by defendant, in violation of 18 U.S.C. § 641. Count II of the indictment charges that from approximately May 2009 to June 2010, defendant "did knowingly embezzle, steal, purloin, and convert to his use a record, voucher, money, and thing of value of the United States ... in that defendant fraudulently caused $121,131 in U.S. Government electronic funds" intended for the payment of services under BPA SIZ100–09–A–0496 to be transferred to a Jordanian bank account controlled by defendant, also in violation of

18 U.S.C. § 641. Finally, Count III of the indictment charges that in violation of 18 U.S.C. § 208(a), defendant, while employed by the Department of State, "participated ... personally and substantially" in the BPA contract process despite having a personal financial interest in the bank account associated with the given contracts—a conflict of interest. *See* Indictment, Counts I–III. At arraignment, defendant pled not guilty and requested a trial by jury.

## II.

The government argues that the exercise of jurisdiction in this case is appropriate for two reasons. First, the government asserts that there is no need to reach the question of extraterritorial jurisdiction because defendant's conduct fell within the territorial jurisdiction of the United States, given that the wire transfers in question involved banks or bank accounts based in the United States. Second, the government argues that even assuming defendant's conduct does not satisfy territorial jurisdiction, the statutes themselves must be construed to allow for the exercise of extraterritorial jurisdiction.

### A. Territorial Jurisdiction

Analysis of the jurisdictional issue raised by defendant's motion appropriate begins with two well-settled presumptions concerning the jurisdiction of federal criminal statutes. First, statutes are presumed to apply to offenses committed anywhere in the territorial jurisdiction of the United States. Second, statutes are presumed not to apply extraterritorially, absent the "clearly expressed" intention of Congress to extend jurisdiction beyond our borders. *United States v. Mohammad–Omar*, 323 Fed.Appx. 259, 261 (4th Cir.2009) (citing *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274

**836**

(1991)); *see also Reyes–Gaona v. N.C. Growers Ass'n,* 250 F.3d 861, 864 (4th Cir. 2001); 18 U.S.C. § 3231 (establishing the criminal jurisdiction of federal district courts). The statutes in issue, 18 U.S.C. §§ 641 and 208, clearly apply throughout the territory of the United States, but it is a more difficult question whether the statutes extend extraterritorially. Therefore, before addressing the extraterritoriality question, it is appropriate to consider whether defendant's conduct occurred within the territorial jurisdiction of the United States.

■ Generally, territorial jurisdiction is proper where "the offense, or part of the offense, occurred within the United States." *See United States v. Moncini,* 882 F.2d 401, 402–04 (9th Cir.1989). In this regard, "[a]cts done outside a jurisdiction, but intended to produce and producing detrimental effects within it," justify the exercise of territorial jurisdiction. *See Strassheim v. Daily,* 221 U.S. 280, 285, 31 S.Ct. 558, 55 L.Ed. 735 (1911). Yet, the Fourth Circuit has also noted that "[m]inimal contact with the United States should not automatically render conduct domestic." *In re French,* 440 F.3d 145, 149 (4th Cir.2006).

While the general principles of territorial jurisdiction are well settled, the parties identify no cases—and none has been found—elucidating precisely what minimum level of contact with United States territory will trigger territorial jurisdiction for the statutes in issue. The leading case in the Fourth Circuit on territorial jurisdiction appears to be *In re French,* in which the Fourth Circuit applied these principles to determine whether an alleged fraudulent transfer in violation of the Bankruptcy Code was territorial or extraterritorial in nature. As an initial matter, the *French* opinion noted that the Fourth Circuit had never before defined "extraterritorial" for the purposes of jurisdiction.

*Id.* at 149–50. The Fourth Circuit in *French* began its analysis with the premise that the analysis should "eschew rigid rules in favor of a more flexible inquiry," and it concluded that the analysis should turn on "whether the participants, acts, targets, and effects involved in the transaction at issue are primarily foreign or primarily domestic." *Id.* In those circumstances, the *French* court found the conduct in question was "domestic" because "the perpetrator and most of the victims of the fraudulent transfer [except one] have long been located in the United States," meaning that "the effects of this transfer were (naturally) felt most strongly here, and not in the Bahamas." *Id.* at 150. Additionally, the allegedly wrongful decision to transfer the property in question for "less than a reasonably equivalent value in exchange" was made in the United States, and that conduct fulfilled a material element under the fraudulent transfer statute. *See* 11 U.S.C. § 548(a)(1)(B). Accordingly, the *French* court concluded that because the bulk of the alleged unlawful conduct occurred within the United States, the Bankruptcy Code provisions in issue covered the alleged constructively fraudulent transfer, and it was unnecessary to consider whether the provisions had extraterritorial effect.

■ The principles in *French,* applied here, point persuasively to the result opposite of that reached in *French.* Here, there can be no question that defendant's conduct was primarily foreign, not primarily domestic. Defendant was employed by USEB in Baghdad to engage local vendors in Iraq, and all of the contracts in question were approved, signed, and supervised by Department of State personnel in Baghdad. All of defendant's alleged criminal conduct occurred outside the United States.

In opposing this conclusion, the government relied initially only on the fact that the bank account owned by defendant's wife and used by defendant to receive the alleged unlawful wire transfers was an account at Cairo Amman Bank, a bank having a correspondence relationship with an American bank. This fact alone adds nothing to the extraterritorial jurisdiction calculus. Correspondence banks are typical in interbank transactions and allow, *inter alia,* for a foreign bank with no branches in the United States to trade with a bank in the United States using a correspondent bank as an intermediary. *See, e.g., Citibank, N.A. v. Wells Fargo Asia,* 495 U.S. 660, 663, 110 S.Ct. 2034, 109 L.Ed.2d 677 (1990) (discussing the function of correspondent banks in interbank trading). It does not follow from the mere assertion that Cairo Amman Bank uses Bank of New York Mellon as its correspondent bank that any wire transfers at issue in this case passed through the Bank of New York Mellon. Later, on the morning of trial, the government proffered that it would adduce additional evidence on that issue at trial, namely that to complete the wire transfers in issue, a bank in Bangkok, Thailand, which serves as a hub for some of the government's international financial transactions, had to arrange for the funds in issue in this case to be wired from a government account at Bank of America Thailand in New York to Cairo Amman Bank's correspondence bank, Bank of New York Mellon; Bank of New York Mellon then wired the funds to defendant's wife's

account at Cairo Amman Bank. Thus, the government argued that territorial jurisdiction is justified because the funds transited at least one bank in New York. In support of its argument that such transiting of the domestic financial system is sufficient to trigger territorial jurisdiction, the government cites wire fraud cases. *See, e.g., United States v. Gilboe,* 684 F.2d 235, 238 (2d Cir.1982) (mere transiting of the domestic wires "to obtain the proceeds of [defendant's] fraudulent scheme" was sufficient to satisfy the exercise of territorial jurisdiction in a wire fraud prosecution). But these cases are not persuasive because the heart of wire fraud is the misuse of domestic wires, whereas the conversion and conflict of interest statutes in this case, 18 U.S.C. §§ 641 and 208(a), primarily focus on unlawful conduct that need not occur in the United States or involve domestic wires. In any event, because this evidence has not yet been adduced, it is unclear if such facts would be enough to trigger territorial jurisdiction. *See French,* 440 F.3d at 149 (noting that "minimal contact" with the United States should not "automatically render conduct domestic"). Accordingly, it is necessary to consider whether the statutes in issue may apply to extraterritorial conduct.[2]

## B. Extraterritorial Jurisdiction

Case law considering whether various statutes have extraterritorial effect is not extensive, but the available cases do make clear that the presumption noted earlier—that all federal criminal statutes apply only

---

**2.** It should also be noted, although not addressed by the parties, that the mere fact that defendant's alleged criminal conduct occurred at a United States embassy does not mean the offense occurred within the territorial jurisdiction of the United States. Although United States embassies abroad are deemed to be within the "the special maritime and territorial jurisdiction" of the United States, *see* 18 U.S.C. § 7(3), the statutes here do not invoke the special maritime and terri-

torial jurisdiction of the United States. Indeed, ordinary territorial jurisdiction—the form of jurisdiction presumed to apply to all federal criminal statutes—does not embrace United States embassies abroad. *See United States v. Passaro,* 577 F.3d 207, 212 (4th Cir. 2009); *Agee v. Muskie,* 629 F.2d 80, 111 (D.C.Cir.1980), *rev'd on other grounds sub nom. Haig v. Agee,* 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981).

to conduct within the territorial jurisdiction of the United States—may be overcome in one of two ways. *See Arabian,* 499 U.S. at 248, 111 S.Ct. 1227; *French,* 440 F.3d at 149. First, Congress may explicitly draft the statute "to extend its coverage beyond places over which the United States has sovereignty or has some measure of legislative control." *Arabian,* 499 U.S. at 248, 111 S.Ct. 1227. Because the statutes under which defendant is charged here, 18 U.S.C. §§ 641 and 208(a), do not expressly authorize extraterritorial jurisdiction, extraterritoriality cannot be supported on this basis. The second basis for extraterritorial jurisdiction, and the one applicable in this case, is supplied by the Supreme Court's 1922 opinion in *United States v. Bowman,* 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922). In *Bowman,* which remains the most thoroughly elucidated Supreme Court opinion on this issue, the Supreme Court held that the presumption against extraterritorial effect of legislation does not apply to

> criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated, especially if committed by its own citizens, officers or agents.

*United States v. Bowman,* 260 U.S. 94, 98, 43 S.Ct. 39, 67 L.Ed. 149 (1922). For this class of offenses, the Supreme Court recognized that "to limit [a given statute's] locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries as at home." *Id.*

Courts analyzing whether statutes apply extraterritorially have consistently proceeded by comparing the statutes and conduct in question to the statutes and conduct in *Bowman. See, e.g., Cotten,* 471

F.2d 744, 750 (9th Cir.1973) (finding the exercise of extraterritorial jurisdiction appropriate for violations of 18 U.S.C. § 641); *United States v. Delgado–Garcia,* 374 F.3d 1337, 1345 (D.C.Cir.2004) (same result, analyzing 8 U.S.C. § 1324(a)); *United States v. Frank,* 599 F.3d 1221 (11th Cir.2010) (same result, analyzing 18 U.S.C. § 2251A). Therefore, the analysis here appropriately begins with the facts and reasoning of *Bowman.* In that case, three American citizens and one British subject engaged in a scheme to defraud the United States Shipping Board Emergency Fleet Corporation ("Fleet Corporation"), a corporation in which the United States was the sole stockholder. Of the four conspirators, two were sailors aboard the Dio, a federally-owned ship, one was a local merchant in Rio de Janeiro, and the fourth was a Standard Oil Company agent. The conspirators hatched a scheme whereby they arranged to have only six hundred tons of fuel oil delivered to the Dio rather than the one thousand tons ordered by the Fleet Corporation, and because the Fleet Corporation would pay for the one thousand tons ordered, the conspirators could pocket the overpayment. When the scheme was discovered, the conspirators—with the exception of the British subject, who could not be found—were indicted. The statute they were accused of violating, § 35 of the Criminal Code, provided, in pertinent part, that no person may

> make or cause to be made ... for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, any claim upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent. . . .

*Id.* at 101, 43 S.Ct. 39 (quoting § 35 of the Criminal Code, as amended October 23, 1918, c. 194, 40 Stat. 1015). The statute's reference to United States corporations was intended to prevent fraud on, *inter alia,* the Fleet Corporation, a corporation that acquired and operated merchant ships for national defense and commercial purposes during World War I. *Id.* The Supreme Court noted that the Fleet Corporation was engaged in global oceanic transportation, and it naturally followed that Congress would "have in mind that a wide field for such frauds upon the Government was in private and public vessels of the United States on the high seas and in foreign ports and beyond the land jurisdiction of the United States, and therefore intend to include them in the section." *Id.* In the analysis, Chief Justice Taft compared the statute to others that would similarly qualify for extraterritorial application, particularly those statutes under the title "Offenses against the operations of the Government," which then included such crimes as bribing federal officials, including naval officers and consuls. *Id.* at 98–100, 43 S.Ct. 39. Chief Justice Taft observed that offenses punished by such statutes "would naturally often occur at sea, and Congress could not have meant to confine it to the land of the United States." *Id.* at 99–100, 43 S.Ct. 39.

*Bowman* teaches that the critical factors for the extraterritoriality analysis are (i) whether the statutes "are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated," and (ii) whether limiting the statute's "locus to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed by citizens on the high seas and in foreign countries

as at home." *Id.* at 98, 43 S.Ct. 39. Courts since *Bowman* have consistently applied these principles in assessing whether a particular statute has extraterritorial effect. *See Cotten,* 471 F.2d at 750 (analyzing § 641); *United States v. Vasquez–Velasco,* 15 F.3d 833, 840–41 (9th Cir. 1994) (analyzing drug smuggling statutes); *United States v. Benitez,* 741 F.2d 1312, 1316–17 (11th Cir.1984) (analyzing statute punishing murder of agents from the Drug Enforcement Agency) *United States v. Layton,* 855 F.2d 1388, 1395–96 (9th Cir. 1988) (analyzing statute punishing murder of a United States congressman).

Particularly pertinent here is the Ninth Circuit's opinion in *Cotten* analyzing 18 U.S.C. § 641, the first of the two statutes under which defendant is charged in this case. That decision is the only case that has been found analyzing either of the statutes charged in this case. In *Cotten,* the Ninth Circuit held that § 641 applied extraterritorially, noting that it was "inconceivable that Congress, in enacting Section 641, would proscribe only the theft of government property located within the territorial boundaries of the nation." *Cotten,* 471 F.2d at 750. The Ninth Circuit's analysis closely tracks the analysis in *Bowman:*

> The law violated proscribes the taking of Government property. That law certainly represents an exercise by the Government of its right to defend itself from obstructions and frauds. To say that it is limited in its application [to territorial violations] is to allow and condone lawlessness at Government installations wherever located. We must conclude that the enactment is a member of that class of proscriptions which is not logically dependent upon the locality of violation for jurisdiction....

*Id.* at 750.

Cases following *Bowman* have consistently found the exercise of extraterrito-

rial jurisdiction appropriate for statutes targeting crimes primarily involving government personnel or assets because, consistent with *Bowman*, the nature of the offenses targeted makes the presumption against extraterritorial jurisdiction inappropriate. *See, e.g., Cotten*, 471 F.2d at 750 (18 U.S.C § 641); *Benitez*, 741 F.2d 1312, 1316–17 (statute punishing murder of DEA agents) *Layton*, 855 F.2d 1388, 1395–96 (statute punishing murder of a United States congressman). The same result sensibly obtains here for both statutes under which defendant is charged. Section 641 primarily protects government financial assets from conversion and theft, and § 208(a) protects the integrity of government contracts by ensuring that no government employee participate in a government contract in which the employee has a financial interest, lest the participation corrupt the government's financial dealings. These offenses are akin to the "[o]ffenses against the operations of the Government" discussed in *Bowman*, which by their very nature would be equally offensive to the United States regardless of where the conduct occurred. *Bowman*, 260 U.S. at 98–99, 43 S.Ct. 39. The protection of government financial assets and government contracts is an important federal interest, and such statutes are "not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated." *Bowman*, 260 U.S. at 98, 43 S.Ct. 39.

Defendant counters that *Bowman* involved the prosecution of United States citizens, and the Supreme Court has yet to decide whether the same result would be warranted in a case involving a non-citizen, such as defendant. It is true that the *Bowman* defendants were United States citizens, but the Supreme Court's analysis did not turn on this fact. A careful reading of *Bowman* leaves little doubt in this regard. The most direct reference to defendants' citizenship in *Bowman* came when Chief Justice Taft noted that fraud against the government does not logically call for a territorial limitation "*especially* if committed by [the government's] own citizens, officers or agents." *Id.* (emphasis added). As the use of the word "especially" suggests, a defendant's United States citizenship strengthens the justification for extraterritoriality, but is not required for such a finding. Moreover, in determining whether extraterritorial jurisdiction applied, the *Bowman* opinion focused on the nature of the harms—*i.e.*, government theft and corruption—and not the characteristics or nationalities of the perpetrators. The harms targeted by the statutes in this case are, of course, conversion of government funds, 18 U.S.C. § 641, and malfeasance in government contracts based on conflicts of interest, 18 U.S.C. § 208(a), and like the statutes discussed in *Bowman*, it is illogical—indeed, it is "inconceivable"—to presume that Congress intended to limit enforcement of these statutes to United States territory. *See Cotten*, 471 F.2d at 750 (discussing § 641). To hold otherwise—that is, to limit the jurisdictional reach of the statutes as defendant suggests—would be "greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds." *Bowman*, 260 U.S. at 98, 43 S.Ct. 39.

Defendant also argues that extraterritorial enforcement of these statutes would violate the law of nations. Although international law does not bind Congress, it is appropriate to consider such principles inasmuch as the Supreme Court has observed that while "it clearly has constitutional authority to do so, Congress is generally presumed not to have exceeded those customary international-law limits on jurisdiction." *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 814–15, 113

S.Ct. 2891, 125 L.Ed.2d 612 (1993); *see also United States v. Yousef,* 327 F.3d 56, 91 (2d Cir.2003). The Fourth Circuit has observed that international law generally permits the exercise of extraterritorial criminal jurisdiction by a nation where otherwise justified by any of five general principles: (i) the objective territorial principle, (ii) the nationality principle, (iii) the universality principle, (iv) the passive personality, and (v) the protective principle. *United States v. Alomia–Riascos,* 825 F.2d 769, 771 (4th Cir.1987); *see also Yousef,* 327 F.3d at 91 n. 24 (describing the principles). Of these five principles, two—the protective principle and the objective territorial principle—are directly applicable here.[3] The protective principle "permits a nation to assert subject matter criminal jurisdiction over a person whose conduct outside the nation's territory threatens the national interest." *Id.* For example, the protective principle justifies the exercise of jurisdiction "over foreign nationals for possession of large quantities of narcotics on foreign vessels upon the high seas, even in the absence of a treaty or arrangement." *Id.* (citing *United States v. Romero–Galue,* 757 F.2d 1147, 1154 (11th Cir.1985)). The statutes here, which target government theft and corruption, certainly advance an important national interest that cannot be understated. Theft from government bank accounts and corruption of government contracts by individuals employed at our embassies abroad cannot be left solely to prosecution by foreign governments in whose territory the embassies may be located. As for the objective territoriality principle, international law permits "jurisdiction over conduct committed outside a State's borders that has, or is intended to have, a substantial effect within its territory." *Yousef,* 327 F.3d at 91 n. 24. As the Ninth Circuit noted in analyzing § 641, the objective territoriality principle justifies the exercise of extraterritorial jurisdiction under international law because the United States "has a paramount interest in protecting its property, wherever located, by assertion of its penal laws." *Cotten,* 471 F.2d at 749. This conclusion applies with equal force to corruption in connection with government contracts as proscribed by § 208(a). In sum, these two principles of international law more than justify the exercise of extraterritorial jurisdiction here, and thus, the presumption that Congress does not legislate in such a way as to violate the law of nations is not contravened in this case.

In sum, based on the nature of the alleged offenses, the statutes under which defendant has been charged are not subject to the presumption against extraterritorial jurisdiction, and instead, these statutes are appropriately construed to extend to defendant's alleged extraterritorial offense conduct.

## III.

There is a final constitutional question that neither party addressed but is nevertheless appropriately considered. The

---

**3.** The remaining three principles are not applicable here. First, the nationality principle provides for jurisdiction over extraterritorial acts committed by a nation's own citizens, which is inapplicable given defendant is not an American citizen. *Yousef,* 327 F.3d at 91 n. 24. Second, the passive personality principle provides for jurisdiction over acts that harm a nation's citizens abroad, which does not apply here as the harm alleged is primarily, if not exclusively, harm to government assets, not American citizens. *Id.* Finally, the universality principle provides for jurisdiction over extraterritorial acts that are so heinous as to be "universally condemned by all civilized nations," which would not generally apply to conversion of government funds or corruption in the administration of government contracts. *Id.*

Fourth Circuit, following the Second and Ninth Circuits, has recognized that once a statute is construed as having extraterritorial application, due process is not satisfied unless there is "a sufficient nexus between the defendant and the United States, so that [the] application [of the statute] would not be arbitrary or fundamentally unfair." *United States v. Mohammad–Omar*, 323 Fed.Appx. 259, 261 (4th Cir.2009) (quoting *United States v. Yousef*, 327 F.3d 56, 111 (2d Cir.2003); *United States v. Davis*, 905 F.2d 245, 248–49 (9th Cir.1990)). The nexus requirement, the Fourth Circuit reasoned, "serves the same purpose as the minimum contacts test in personal jurisdiction," namely ensuring that "a United States court will assert jurisdiction only over a defendant who should reasonably anticipate being haled into court in this country." *Id.* (quoting *United States v. Klimavicius–Viloria*, 144 F.3d 1249, 1257 (9th Cir.1998)). For example, in *Mohammad–Omar*, the court found sufficient contacts to justify the extraterritorial application of 21 U.S.C. § 952—a statute prohibiting the importation of controlled substances—to a defendant who "had ample reason to anticipate being haled into court in the United States on account of his drug trafficking activity in Afghanistan, Dubai, and Ghana." *Id.* at 262. Specifically, the defendant's partner knew the heroin he sold was destined for the United States and personally met with an undercover agent believed to be a United States heroin distributor. Because defendant knew the details and scope of this deal, the Fourth Circuit concluded his conduct was sufficient to justify extraterritorial application of the statute without violating due process, even though his conduct occurred entirely outside the United States. *Id.*

█ Here, as in *Mohammad–Omar*, the record facts establish a sufficient nexus between defendant and the United States

to warrant prosecuting defendant in this country. The government has alleged more than sufficient facts that, if true, demonstrate that defendant's prosecution in the United States "would not be arbitrary or fundamentally unfair." *Mohammad–Omar*, 323 Fed.Appx. at 261. Defendant's employment with the Department of State at the United States Embassy in Baghdad was central to the commission of his alleged crimes. Using a fictitious email address, defendant allegedly led embassy officials to believe they were contracting with and purchasing services from a third party vendor when, in fact, the money was being transmitted to a bank account controlled by defendant. Just as the defendant in *Mohammad–Omar* had ample reason to anticipate being haled into court in the United States on account of his drug trafficking activity abroad, so, too, would defendant here have had ample reason to expect prosecution in the United States. Accordingly, defendant's prosecution in this country does not offend due process.

## IV.

Accordingly, for the reasons stated, defendant's motions to dismiss for improper exercise of extraterritorial jurisdiction must be denied.

An appropriate Order has already issued, and the Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.